**DEERFIELD HUTTERIAN ASSOCIATION, an unincorporated association, and Sam Waldner, representing himself and other members of the class similarly stated, Plaintiffs,**

v.

**IPSWICH BOARD OF EDUCATION, Ipswich Independent School, District 22–3, Thomas Halvorson, individually and as Superintendent of Ipswich Public Schools, and Lyle Palmer, Henrietta Gauer, James Davis, Everett Omland, and Myron Fillbach, individually and as members of the Ipswich Board of Education, Defendants.**

Civ. No. 76–1022.

United States District Court,
D. South Dakota, N. D.

April 17, 1979.

---

Harvey C. Jewett of Siegel, Barnett, Schutz, O'Keefe, Jewett & King, Aberdeen, S. D., for plaintiffs.

Anthony N. Buckmeier, Mobridge, S. D., and James A. Wyly of Richardson, Groseclose, Kornmann & Wyly, Aberdeen, S. D., for defendants.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

The plaintiffs, Deerfield Hutterian Association, et al., have petitioned this Court to enjoin the defendants, Ipswich Board of Education, et al., from carrying on and perpetrating religious and national origin discrimination against the plaintiffs. The plaintiffs have also requested that this Court order the defendants to establish and organize a school at or near the Deerfield Hutterite Colony. While the plaintiffs' arguments are interesting and appealing, the arguments fall short of the mark. The

relief which the plaintiffs seek is, therefore, denied.

The plaintiffs, pursuant to S.D.C.L. 13–23–9 (1975)[1], have requested the Ipswich Board of Education to provide funds to establish a school and a teacher at or near the Deerfield Hutterite Colony. The Board of Education, however, has refused to establish such a school for numerous reasons. The plaintiffs are claiming that, after the facade has been cleared away, the real reason for the Ipswich Board of Education's refusal to establish the requested school is discrimination based on the Hutterites' religious beliefs and national origin.

The plaintiffs have proceeded under four legal theories. The first three theories allege discrimination in violation of 42 U.S.C. Section 1983 (1976)[2], 42 U.S.C. Section 2000d (1976)[3] and 20 U.S.C. Section 1703

(1976)[4]. The fourth legal theory offered by the plaintiffs arises under state law[5] and it is alleged that the Court may hear this part of the plaintiffs' case under the doctrine of pendent jurisdiction.

This case was tried to the Court in a week-long trial beginning May 1, 1978. At the conclusion of the trial a briefing schedule was set up and it was agreed that counsel would submit written arguments. Both plaintiffs' counsel and defendants' counsel have written extensive and enlightening briefs. Issues have been amply framed and discussed and an abundance of legal authority has been supplied.

## HISTORY[6]

Hutterite history had its birth during the 16th Century. It is a history often marred

1. S.D.C.L. 13–23–9 (1975). *Establishment of elementary school on petition by isolated residents within mile of each other.*—If a petition, signed by the persons charged with the support and having the care and custody of fifteen or more students who are eligible to attend an elementary school, all of whom reside not less than four miles from the nearest school but all of whom reside within one mile of each other, is presented to any school board asking for the organization of an elementary school for such children, the board may organize such school and employ a teacher therefor provided a suitable room or building is made available by such petitioners at a proper location not more than four miles distant from the residence of any one said child or, if further, that said petitioners shall provide the necessary transportation thereto. The provisions of this section shall not be available to persons residing in any incorporated city or town or any unincorporated platted area.

2. 42 U.S.C. Section 1983 (1976). *Civil action for deprivation of rights.* Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. 42 U.S.C. Section 2000d (1976). *Prohibition against exclusion from participation in, denial of benefits of, and discrimination under Federally assisted programs on ground of race, color,*

or national origin. No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

4. This statute reads in pertinent part, 20 U.S.C. Section 1703 (1976): *Denial of cqual educational opportunity prohibited.* No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by— . . . (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

5. S.D.C.L. 13–23–9 (1975) is cited in full in footnote 1. The defendants claim that the plaintiffs' only remedy from an adverse decision by the school board lies in an appeal under S.D.C.L. 13–46–1 (1975) which states: *"Right to appeal to circuit court from decision by school board or special committee—Time of taking appeal.*—From a decision made by any school board, . . . an appeal may be taken to the circuit court by any person aggrieved, or by any party to the proceedings, . . . within ninety days after the rendering of such decision.

6. Some of the historical and cultural background of the Hutterites used in this opinion is taken from a book which is an authoritative source. (See page 38 of the cross examination of Levi Tschetter, Sr.) Hostetler, John, *Hutterite Society* (Baltimore, Md., The Johns Hopkins University Press, 1974).

by tragedy. The Hutterites can trace their religious roots to the Anabaptist movement which occurred during the Reformation. Anabaptists were considered radicals whose most conspicuous characteristic was their repudiation of infant baptism. The Hutterites were only one of several groups who made up the Anabaptist movement.

The Hutterites came together during the reign of Charles V, Holy Roman emperor and king of Spain. (It was Charles V who, as Holy Roman emperor, was responsible for the protection of the Roman Catholic Church.) In 1529 an imperial law decreed that those who did not desist from Anabaptism would be given the death penalty. Charles V's brother, Ferdinand, ruler of Austria, decreed that the Anabaptists were to be exterminated by fire and sword.

The Anabaptist group which evolved into the Hutterites originated in the area known as Tyrol located on what is now the Austrian-Italian border. Events soon persuaded the Hutterites that they would be better off practicing their religious beliefs in another region. Because of religious persecution, many followers of the Anabaptist movement left Tyrol for a safer refuge, Moravia. Even there the Hutterites were not free from persecution. Eventually, Jacob Hutter, leader of the Hutterites, and many of his followers were put to death for their beliefs. Hutter suffered a particularly painful death. After being whipped severely, brandy was poured over his lacerated flesh and set aflame.

Religious persecution forced the Hutterites to move many more times over the next two centuries. Finally, they moved to the United States in the 1870's.

The first colony organized in this country was in Dakota Territory in Bon Homme County just west of Yankton. This is a "mother colony" from which many of the other colonies have sprung.

There are now well over 100 Hutterite colonies in existence in the upper great plains region. The location of these colonies is widespread. Colonies exist in North and South Dakota, Minnesota, Montana and Canada. There are presently 35 Hutterite colonies in South Dakota. Located east of Ipswich, South Dakota, Deerfield Colony was recently established. It was founded in 1971.

## LANGUAGE AND CUSTOMS

The Hutterites speak Tyrolean German because their roots are found in Tyrol where they originated. The language was carried with them through their many moves in Europe and eventually to this country.

Hutterite Tyrolean German has undergone some changes since the early days of the 16th Century. The language has become Anglicized since the 1870's when the Hutterites moved here. For example, instead of using the German equivalent for airplane, the Tyrolean language has incorporated the actual word used by the English-speaking people. This is true for numerous other words that have entered the language since the Hutterite move to this country.

The uniqueness of the Hutterites' language is, according to plaintiffs' counsel, the pivotal aspect of the plaintiffs' lawsuit. The Hutterites are the only people in the world presently speaking Tyrolean German as their primary language. The difficulties which result are enormous. Obviously, in the context of this case, that fact is significant, particularly when translations are considered. There are few, if any, persons who are not Hutterites who speak Tyrolean German. For all practical purposes the only people available to translate Tyrolean German are the Hutterites. Dr. Cook, a German instructor from Northern State College, testified that he was fluent in numerous dialects of the German language yet was unable to understand most of the conversations which took place in Tyrolean German.

Tyrolean German is the language used by the Hutterites to converse with each other. It is the everyday language of the colony. The use of the English language is not encouraged in the colony, and Tyrolean German is maintained for religious reasons,

for reasons of cultural tradition, and to foster a separate sense of identity. As a result the children growing up on the colony speak only Tyrolean German. It is not until they reach the 1st grade level that they have any exposure to the English language.

The Hutterites, like the Amish, rarely continue their education beyond the 8th grade. They have several reasons for not going beyond the 8th grade. Of course, one of the primary reasons is their religious objection to the "advanced" education received in the upper grades. Collaterally, they feel that the constant exposure to worldly goods and ideas is harmful both religiously and in terms of the temptation it offers for people to leave the colonies. The net result is that there are only a few Hutterites who have graduated from college. Levi Tschetter, Sr., who testified at trial is the only Hutterite in the United States who is a qualified schoolteacher.

When the Hutterite children start attending school for the first time, the teacher is unable to communicate directly with them, unless of course they are in Mr. Tschetter's class. In order to overcome the language barriers, the teachers are forced to use the older children in the classroom (students from the 7th or 8th grades) to act as translators. This "system" is utilized in most, if not all, of the Hutterite schools in South Dakota. It is only at the 7th or 8th grade level that the Hutterite students' command of English can be termed proficient and even then the thought process almost always occurs in Tyrolean German.

Tyrolean German is an oral language. It does not exist in a written form. The problems with Tyrolean German are thus multiplied. Not only are the Hutterites the only group to speak Tyrolean German, they are unable to write in their native and dominant language because a written form of the language is non-existent.

The Hutterites' link with the past, their history and sermons, is preserved in High German. Furthermore, the Hutterites conduct their religious services in that language. The Hutterites do not use High German on a regular basis other than in their religious services. They do not use it as a means of written communication. The Hutterites can read and understand the familiar passages of sermons written in High German but few, if any, other than their preachers, have the ability to use it for everyday purposes.

The Hutterites have incorporated into their lifestyle many other traditions and practices which are unique to American culture. One of the basic tenets of their religion is communal living. The Hutterites believe that Christians can gain eternal salvation only if they live their lives on earth sharing everything with their brethren. Thus, it is paramount that an individual live at the colony because it is only through the lifestyle practiced by colony members that eternal salvation may be gained. Worldly goods are to be shunned. Simplicity and living with the bare essentials is applauded. This is one of the reasons that the Hutterites refuse to allow their children to attend town school. In town they are constantly exposed to worldly goods and temptations. The temptations offer a dual risk to the colony. First, since they are interested in the spiritual health of their members, the Hutterites do not like to see a member succumb to the siren's call of worldly goods. Second, a member who accepts the temptations of the outside world and drops out of the colony jeopardizes the remaining members because his workload must then be picked up and shared by them. If too many members stray from the flock, the colony could collapse.

Communal life at a Hutterite colony involves a simple agrarian lifestyle. Women are required to tend gardens while men work in the fields. Meals are taken at the communal dining hall. Everything is owned by the colony, and thus by the members collectively, except for a few personal items such as clothes.

Clothes are another item which distinguish the Hutterites from most other people living in this country. Though dress is not strictly dictated by their religious beliefs, the principles of modesty are a foremost

concern especially for the women of the colony. The women wear simple black dresses, occasionally with a nondescript pattern. The neckline of their dresses is quite high. It usually surrounds the neck. The length of their dresses is ankle-length or longer. They may wear plain aprons and are always seen in public wearing a hat or cap. Dresses are always long-sleeved and shoes are almost always black. Men's attire is similar in its simplicity. Black shoes, black pants, white shirt and a hat or cap are almost always worn. In addition, most men have a full beard that is neatly trimmed. The Hutterite children dress in a similar manner. Clearly, both the elders and the children are distinguishable by their dress.

## SOUTH DAKOTA COLONY SCHOOLS

There are 35 Hutterite colonies in South Dakota of which 24 have schools supported by local school boards. At each of these schools, the materials used by the teachers are selected by the school board. The 24 schools located at the colonies are in essence separate attendance centers where only Hutterite children attend classes. There is no restriction on non-Hutterites attending these schools if they choose. But for numerous reasons the non-Hutterite children in the area have chosen to take the busses to schools located in town or elsewhere. Among the schools located at the colonies is one at the Plainview colony. This school is an old common school district, now run by the Ipswich Board of Education.

Most, if not all 24, of the colony schools were established before South Dakota made a concerted effort to consolidate rural school districts. Reorganization of the numerous rural school districts was attempted and for the most part these rural school districts decided to consolidate. The process consisted of having the residents of the school district vote on whether or not to close their schools. For obvious reasons, the residents voted against closing the colony schools. The voters in those elections were comprised mostly of Hutterites.

7. The split was not caused by any differences between factions or groups. It was merely a matter of too many people in the colony. Given a limited amount of land, the colony is able

The request by the Deerfield Colony that the Ipswich Board of Education operate a school at Deerfield is not unique. The Pembrook Colony, also under the jurisdiction of the Ipswich Board of Education, every year requests the Board to set up a school at the Pembrook Colony. The Board has not complied with the Pembrook Colony request for the same reasons that it has not established a school at the Deerfield Colony.

In 1961 Hutterite children from the Hillside Colony and the Clark Colony came into town to attend the Doland Public Schools. This experience has been called the "Doland Experiment". The chairman of the Doland School Board at the time, Mr. Earl Hansen, testified that tests were to be given so that the children could be assigned to the proper grades. However, before the testing and reassignment could be completed, the Hutterite children were removed from the school, at the request of the Hutterite leaders. Mr. Hansen also testified that there was a lot of interaction among the Hutterite and non-Hutterite children. The children seemed to be making friends. There were no insuperable problems. On the last day of school when the children knew they were leaving some cried and were upset that they were leaving the town school.

## DEERFIELD SITUATION

The total population of the Deerfield Colony numbers 105. There are 25 school age children residing at that colony. This evidently is the approximate size of other colonies within the Ipswich Board's jurisdiction. There are 33 school age children at the Plainview Colony.

The student population in Ipswich is over 500 students. The percentage of Hutterite children from the Deerfield Colony to the total student population in Ipswich is less than 5 percent.

Originally, members of the Deerfield Colony were members of the Plainview Colony but in 1971 they left the Plainview Colony.[7]

to support only a given number of people and when that number is met or exceeded, some members leave to form a new colony.

During the 1971–72 school year, Deerfield children were bussed to Plainview so that they could attend school at that publicly-supported institution. Plainview children were also in attendance there. The following year the Ipswich Board of Education did not allow the Deerfield residents to send their children to the Plainview school. The Board stated that it was their intention that the Deerfield children's attendance at the Plainview school would be a temporary solution.

Since that time the Ipswich Board of Education has offered to bus the Deerfield children into Ipswich. The Board does not feel that bussing the children to Plainview offers a realistic solution. The facilities at Plainview are inadequate to accommodate the additional students. An additional classroom would need to be built. It would be difficult to add onto the Plainview school because there is not enough property. In addition, there is no hot lunch program at Plainview. Furthermore, the Board does not feel that the Plainview facilities are as good as those offered in Ipswich. Most importantly, the additional students at Plainview would go against the efforts and practices of the Board to try to consolidate as much as possible.

On several occasions the busses have been sent to the Deerfield Colony but the Colony members refuse to allow their children to board the busses which would take them to Ipswich.

The Board has expressed a deep and continuing concern for the educational needs of the Deerfield children. This has been exhibited not only by their efforts to have the children bussed to Ipswich, the Board has also indicated that it will do whatever is necessary to establish a successful bilingual-bicultural program which would help the Hutterite children adapt to the town school. The Board, however, is not able to do anything toward establishing such a program at this time since the children have not yet been tested. The Hutterites have not allowed the children to be taken to town even for the innocuous task of testing the children to see what kind of bilingual-bicultural program would be successful.

The Hutterites have taken the adamant position that they will not allow the children to be bussed to Ipswich, regardless of what type of bilingual-bicultural program the Board implemented. The Hutterites fear that the children would be subjected to too great a temptation by the constant exposure to worldly goods and ideas in Ipswich. Their religious beliefs would be subjected to public question and criticism.

Much has been made by both counsel about the psychological implications of allowing the children to be educated at the Colony and the benefits and possible damage which could result by being bussed to Ipswich. Counsel for both sides of this lawsuit offered expert testimony as to what would be best for the children educationally.

The evidence shows that a successful bilingual-bicultural program could be established in Ipswich which would be to the benefit of the Hutterite children. Furthermore, education of the children at the Colony is not in the children's best interest. The Ipswich Board of Education has certain responsibilities to the public it serves, particularly the children who are the subjects of the education controlled by the Board. The decision of the Board that the Hutterites would receive a better education in the town of Ipswich is substantiated by the record. The needs of the children could be completely serviced in town. Classroom space could be made available, personnel would find it easier to service the needs of the children, a hot lunch program is available in town. Most importantly, the Hutterite children would not find it any more difficult to adapt to the experience of being educated in town than they would in a colony school.

Plaintiffs have cited *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15

(1972), and state that it has considerable relevance to the case at hand. Defendants vigorously deny that *Yoder* can reasonably be said to have anything to do with this case. A thorough examination of *Yoder*, its facts and its conclusions, is, therefore, in order.

Plaintiffs have quoted extensive passages from *Yoder* in their brief. Their reason for doing so is to establish the similarity between the Amish and the Hutterites and the Court assumes that in addition it is their intention to show that *Yoder* is similar to the case at hand. The lengthy quotation cited by the plaintiffs is as follows:

> A related feature of Old Order Amish communities is their devotion to a life in harmony with nature and the soil, as exemplified by the simple life of the early Christian era that continued in America during much of our early national life. Amish beliefs require members of the community to make their living by farming or closely related activities. Broadly speaking, the Old Order Amish religion pervades and determines the entire mode of life of its adherents. Their conduct is regulated in great detail by the Ordnung, or rules, of the church community. Adult baptism, which occurs in late adolescence, is the time at which Amish young people voluntarily undertake heavy obligations, not unlike the Bar Mitzvah of the Jews, to abide by the rules of the church community.
>
> Amish objection to formal education beyond the eighth grade is firmly grounded in these central religious concepts. They object to the high school, and higher education generally, because the values they teach are in marked variance with Amish values and the Amish way of life; they view secondary school education as an impermissible exposure of their children to a "worldly" influence in conflict with their beliefs. The high school tends to emphasize intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success, and social life with other students. Amish society emphasizes informal learning-through-doing; a life of "goodness," rather than a life of intellect; wisdom, rather than technical knowledge, community welfare, rather than competition; and separation from, rather than integration with, contemporary worldly society.
>
> Formal high school education beyond the eighth grade is contrary to Amish beliefs, not only because it places Amish children in an environment hostile to Amish beliefs with increasing emphasis on competition in class work and sports and with pressure to conform to the styles, manners, and ways of the peer group, but also because it takes them away from their community, physically and emotionally, during the crucial and formative adolescent period of life. During this period, the children must acquire Amish attitudes favoring manual work and self-reliance and the specific skills needed to perform the adult role of an Amish farmer or housewife. They must learn to enjoy physical labor. Once a child has learned basic reading, writing, and elementary mathematics, these traits, skills, and attitudes admittedly fall within the category of those best learned through example and "doing" rather than in a classroom. And, at this time in life, the Amish child must also grow in his faith and his relationship to the Amish community if he is to be prepared to accept the heavy obligations imposed by adult baptism. In short, high school attendance with teachers who are not of the Amish faith—and may even be hostile to it—interposes a serious barrier to the integration of the Amish child into the Amish religious community. Dr. John Hostetler, one of the experts on Amish society, testified that the modern high school is not equipped, in curriculum or social environment, to impart the values promoted by Amish society.

*Yoder, supra,* at 210–212, 92 S.Ct. at 1530–1531.

Plaintiffs argue that this passage shows the similarities between the Hutterite people and the Amish people. Furthermore, they argue that one of the motivations of the Hutterite people in establishing their

own schools is an attempt to insulate their children from "worldly values" which the Hutterite people reject. This Court does not take issue with either of those two points. Plaintiffs also urge this Court to accept *Yoder* for the proposition that the state must respect the Hutterites' religious convictions and practices, and that the desire to raise their children separate and apart from the "other world" is a legitimate and bona fide exercise of their religious convictions. This too comports with what this Court believes the holding of *Yoder* to be.

Similarities exist between *Yoder* and the present case. The religious practices and culture of the Amish are very similar to the Hutterites. Both societies attempt to insulate their children from worldly attitudes, practices, and values. Both societies are highly concerned with impermissible influences affecting their children.

Plaintiffs argue that the Hutterites seek only a sound, basic education from the local school authorities. However, they fail to mention that they seek this "sound basic education from the local school authorities" only if it is on the Hutterites' terms. In other words, the Ipswich Board of Education must establish a school at the Deerfield Colony. The Hutterites find the alternative posed by the Board, bussing the students to Ipswich, unacceptable because of their religious beliefs.

This Court does not agree with plaintiffs' contention that they seek to place as little burden as possible upon the Board in asking that the Board establish a school at the Deerfield Colony. The record indicates that the Board's plan would be easiest to implement and finance.

The Court agrees with the plaintiffs that the Hutterites' education should not be and cannot be conditioned upon the abandonment of their religion, the abandonment of their language, the abandonment of their dress, or the abandonment of their fear of worldly values. But the Board has not demanded that the plaintiffs abandon their beliefs. It has simply offered to educate them in Ipswich and it has refused to sup-port their education at the Deerfield Colony. The Board's approach is no different than if the Catholic Church had asked the Board for funds to establish a school for "anyone" but particularly for Catholics and the school is to be located at the Catholic Church. It is quite likely that there would be some constitutional challenges to such a plan. Parochial schools have been set up by members of other religions to avoid the situation about which the Hutterites complain. Protestants, Catholics and Jews from all over the United States have felt the financial pinch of having to support private schools in order to prevent the abandonment of their religious beliefs.

What the Hutterites are seeking is a segregated or a separate school because of what are primarily religious and cultural reasons. The reasons being, of course, the desire to keep the Colony children separated from the world. The Hutterites' beliefs are such that they feel contact with worldly goods and ideas will keep them from eternal salvation. The Board has no right to prevent the Hutterites from practicing their firmly held religious beliefs. This Court strongly disagrees with the plaintiffs' contention that *Yoder* supports their case. *The Yoder case does not stand for the proposition that if a religious group feels strongly about its religious tenets and wishes its children segregated from the world, it can force the state to set up and pay for a separate school for the children.*

The case of *Wisconsin v. Yoder* involved Wisconsin's compulsory school attendance law which required children to attend public or private school until reaching the age of 16. However, the respondents, Amish parents, declined to send their children, ages 14 and 15, to school after they had completed the eighth grade. Following a conviction and a fine of $5.00, the parents appealed on the grounds that the application of the state's compulsory attendance law violated their rights under the First and Fourteenth Amendments. Trial testimony showed that the respondents believed, in accordance with the tenets of the Old Amish communities generally, that their

children's attendance at high school, public or private, was contrary to the Amish religion and way of life. They believed that by sending their children to high school they would not only expose themselves to the danger of the censure of the church community but, as found by the County Court, they would also endanger their own salvation and that of the children. The state stipulated that the respondent's religious beliefs were sincere.

The United States Supreme Court affirmed the decision of the Wisconsin Supreme Court which struck down the state's compulsory school attendance law. The U.S. Supreme Court, in its opinion, conceded that the state has a high interest in universal education, but stated that such interest is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children.

■ *Yoder* stands for the proposition that when a state law infringes upon First Amendment rights, the state interest in doing so will be weighed against the interest of the citizen in not having his First Amendment rights and other interests encroached upon. The essence of *Yoder* is the Wisconsin compulsory education law which forced the Amish to violate their religious beliefs. There is no comparable law in the present case. The *Hutterites* are *not* being *forced* to violate their religious beliefs. They can, if they wish, educate their children at the colony at their own expense. The opportunity to be educated at the expense of the state is not a right which has no limits. An education must be provided by the state on reasonable terms to all persons who desire such an education. The state may not discriminate against any group or individual on an arbitrary or unreasonable basis. However, that is not the situation presented by this case. The Hutterites have demanded that they be educated on their terms. The state does not have an obligation to educate every group or individual according to the whims or desires of that individual or group, even if the desires are based on religious beliefs. Here, the Ipswich School Board has made an education available on a reasonable basis to the Hutterites. It need do no more.

■ The compulsory school attendance law in *Yoder* was held to violate the rights of the Amish under the Free Exercise Clause of the First Amendment. The reverse side of the *Yoder* coin is the Establishment of Religion Clause. It should be made clear that this opinion in no way reflects upon the merits of the Establishment of Religion issue which may develop if the school is placed at the Deerfield Colony. The Court cannot decide the Establishment of Religion issue for several reasons. First, at this time the school has not yet been placed at the Deerfield Colony. There has been no injury to any party and, thus, there is no person who can raise this particular constitutional question at this time. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Second, courts must follow the long established rule that they should not decide constitutional questions where they can be avoided and they should not anticipate questions of constitutional law in advance of the necessity of deciding them. *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Bush v. Texas*, 372 U.S. 586, 83 S.Ct. 922, 9 L.Ed.2d 958 (1963); *Clay v. Sun Insurance Office Limited*, 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960). Third, the pleadings do not raise this issue nor has it been briefed by counsel.

The major portion of the plaintiffs' legal arguments are directed to their equal protection claim. If the plaintiffs were to prove discrimination based on religion or national origin and show that their children's educational opportunities had been diminished as a result, they would prevail on their theories that 42 U.S.C. Section 1983 (1976); 42 U.S.C. Section 2000d (1970); and 20 U.S.C. Section 1703 (1976) had been violated. The plaintiffs have attempted to prove their theories by showing that they

have been denied equal protection of the laws.

■ Basically, there are two distinct standards for review of an equal protection claim. There is the traditional equal protection standard, the rationality test, which is used where there is no fundamental right or suspect class involved. In this type of case, the statute or practice is entitled to a presumption of validity. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The second equal protection standard is one which is invoked where a fundamental right or suspect class is involved. Where either a fundamental right or suspect class is involved, in order for the statute or practice to be upheld, the statute or practice must be shown to promote some compelling state interest and the statute must be narrowly drawn. *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

The U.S. Supreme Court has held that a number of rights are considered fundamental. The right to vote, *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); the right of interstate travel, *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); the right to privacy, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), have all been declared to be fundamental rights.

■ Education is not a fundamental right. In *Rodriguez, supra*, the Court stated that:

Thus, the key to discovering whether education is "fundamental" is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution.

*Rodriguez, supra*, 411 U.S. at 33–34, 93 S.Ct. at 1297. The Court further stated that:

Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected.

*Rodriguez, supra*, 411 U.S. at 35, 93 S.Ct. at 1297.

■ Since no fundamental right is involved, this Court must examine the statute to see if it makes a classification based on race, religion or national origin. The statute in question, S.D.C.L. 13–23–9 (1975), makes no classification based on race, religion or national origin on its face. However, a statute fair on its face can be applied in such a manner as to produce unequal treatment or discrimination. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Where the application of the statute results in discrimination based on race, religion or national origin the action will be held violative of the equal protection clause. But as the Court pointed out in *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944):

The unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. . . . But a discriminatory purpose is not presumed, *Tarrance v. State of Florida*, 188 U.S. 519, 520, 23 S.Ct. 402, 403, 47 L.Ed. 572; there must be a showing of "clear and intentional discrimination", . . . .

See also, *United States v. Wallace*, 578 F.2d 735 (8th Cir. 1978); *United States v. Swanson*, 509 F.2d 1205 (8th Cir. 1975).

■ The plaintiffs have not shown that the statute has been applied discriminatorily. The plaintiffs could have taken

several approaches in order to attempt to prove the intentional or purposeful discrimination in inequitably applying the statute. Plaintiffs could have attempted to show that other non-Hutterite groups had applied to the Ipswich Board of Education and had been granted a school. They did not. Plaintiffs could have attempted to show that individuals who make up the Ipswich Board of Education are hostile to the Hutterites and have acted with prejudice. The plaintiffs failed to do so. All this Court has is the bald allegation that the Ipswich Board of Education acted with prejudice and discrimination. There are no facts which indicate that the Board acted with prejudice or discrimination.

Without facts indicating prejudice or discrimination in the application of S.D.C.L. 13–23–9 (1975) this Court must apply the traditional standard. The test is "whether the statute has a rational relation to a legitimate state interest." *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 489, 97 S.Ct. 1898, 1908, 52 L.Ed.2d 513 (1977). The United States Supreme Court reiterated its position on what standards to apply in an equal protection case in *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), by stating:

> *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16 [93 S.Ct. 1278, 1287, 36 L.Ed.2d 16] (1973), reaffirmed that equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.

*Murgia, supra,* at 312, 96 S.Ct. at 2566. Under the facts of this case, this Court cannot say that strict scrutiny applies and under the traditional standard there has not been a showing that the statute or its application has denied the equal protection of the laws to the plaintiffs. This Court feels that the statute and its application have a rational relation to a legitimate state interest. In this case, the legitimate state interest is in providing maximum discretion to locally autonomous governmental boards.

This comports with the long held tradition in this part of the country of giving as much power to the people as possible, a form of populism. Furthermore, education, unlike other governmental services, is something which can best be implemented and administered on a local level.

Two cases are of particular interest to this case since they involve facts which are similar. In *Martin Luther King Junior Elementary School Children v. Michigan Board of Education*, 451 F.Supp. 1324 (E.D. Mich.1978), the Court held that there is no constitutional right to special educational services to overcome unsatisfactory academic performance based on cultural, social or economic background. The case was brought under 20 U.S.C. Section 1703(f) (1976). The Court held that that section requires a showing of two things: (1) the denial of an educational opportunity on account of race, color, sex, or national origin; and (2) the educational agency's failure to take action to overcome language barriers that are sufficiently severe so as to impede a student's equal participation in instructional programs. This Court adopts the rationale of the *Martin Luther King Elementary School* case.

In the present case, there has been no showing that educational opportunity was denied the Hutterites on account of race, color, sex or national origin. Furthermore, this Court has found that the educational agency has cooperated fully in attempting to overcome the language barriers presented. The agency has stated that it will do whatever is necessary to overcome those barriers. It is the plaintiffs who have resisted and have failed to submit to the necessary testing.

The second case of note is *Guadalupe Organization, Inc. v. Tempe Elementary School District*, 587 F.2d 1022 (9th Cir. 1978). That case was brought under 20 U.S.C. Section 1703 (1976) and 42 U.S.C. Section 2000d (1976). The Court held that the equal protection clause imposed no duty upon the school district to provide bilingual-bicultural education to non-English speak-

ing students nor did 20 U.S.C. Section 1703 or 42 U.S.C. Section 2000d mandate such action. Specifically, the Court stated:

> There exists no constitutional duty imposed by the Equal Protection Clause to provide bilingual-bicultural education such as the appellants requested. The decision of the appellees to offer the educational program attacked by appellants bears a rational relationship to legitimate state interests.

*Guadalupe, supra*, at 1027. In the present case the defendants, the Ipswich Board of Education, et al., have "gone the extra mile." They have offered to do whatever is necessary to provide a successful bilingual-bicultural program. Clearly, they have not denied equal protection of the laws to the plaintiffs.

With respect to any alleged violations of 20 U.S.C. Section 1703 (1976); 42 U.S.C. Section 1983 (1976) and 42 U.S.C. Section 2000d (1976), it is the finding of this Court that the facts do not indicate any violations of any of the above mentioned statutes.

The plaintiffs also allege violations of South Dakota law and claim that this Court has jurisdiction by virtue of pendent jurisdiction.

> The power to exercise pendent jurisdiction is grounded upon the existence of federal subject matter jurisdiction over some claim in the cause of action. Jurisdiction has been held to be established by the existence of a substantial federal question. See, e. g., *Hagans v. Lavine*, 415 U.S. 528, 536–39, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), and exists even if the decision on the merits goes against the federal claimant.

*Kuhn v. National Association of Letter Carriers*, 570 F.2d 757, 759 (8th Cir. 1978). In addition, the Supreme Court has stated that: "The state and federal claims must derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

This Court has jurisdiction over the state claim in this case by virtue of pendent jurisdiction. Where a Court determines to exercise pendent jurisdiction over a state-created claim, state substantive law is controlling on the pendent claim. *Gibbs, supra.*

The law of South Dakota states that an appeal from a decision of the school board must be made within ninety days. S.D.C.L. 13–46–1 (1975). There is no indication in the record that this appeal was made within ninety days of the board's decision. Furthermore, "(t)his *statute provides* a specific and *exclusive means of* obtaining *reversal* of a school board's decision." (emphasis added) *Cutshaw v. Karim*, S.D., 256 N.W.2d 566, 568 (1977). That case also held that an appeal from a school board decision cannot take the form of an ordinary civil appeal. The South Dakota Supreme Court has also held, in *Murray v. Sioux Falls Board of Education*, 88 S.D. 554, 225 N.W.2d 589 (1975), that an aggrieved party could not substitute a suit for an injunction for the appeal provided in S.D.C.L. 13–46–1 (1975).

Even if the appeal was made within the required ninety day time period and we disregard all of the South Dakota Supreme Court decisions militating against this type of lawsuit, we would still decide in favor of the Ipswich Board of Education. *Mortweet v. Ethan Board of Education*, S.D., 241 N.W.2d 580 (1976), sets out the standard of review under South Dakota law. The Court stated that:

> It is our holding that the trial de novo required by SDCL 13–46–6 permits an independent inquiry into the facts, but only for the purpose of passing on the legality of the board's decision. It does not mean that the court may substitute its judgment for that of the board or that the court may justify its decision by a preponderance of the evidence received in the trial de novo.

*Mortweet, supra*, 241 N.W.2d at 582–583. This Court holds that the decision of the Ipswich Board of Education not to organize a school at the Deerfield Colony was not illegal and that the plaintiffs' request for an injunction and order directing the defendants to organize a school at the Deerfield Colony is denied.

Having determined that none of the plaintiffs' allegations of violations of the Constitution and laws of the United States and the Constitution and laws of the State of South Dakota have sufficient merit to warrant a ruling in favor of the plaintiffs, the relief requested is denied.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

Counsel for the defendants shall draw an appropriate judgment.