Medusa Corporation, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued September 12, 1979, before President Judge BOWMAN and Judges CRUMLISH, JR., MENCER, ROGERS, BLATT, DISALLE and CRAIG. Judges WILKINSON, JR. and MACPHAIL did not participate.

*William H. Wallace*, with him, *Michael A. Cyphert; Lloyd R. Persun; William J. Taylor; Kenneth R. Myers; Frank M. Thomas, Jr.;* and, of counsel, *Thompson, Hine and Flory; Shearer, Mette & Woodside;* and *Morgan, Lewis & Bockius*, for petitioner.

*Eugene E. Dice*, Assistant Attorney General, for respondent.

OPINION BY JUDGE CRAIG, May 23, 1980:

Medusa Corporation has presented a petition for review of a final adjudication order of the Environmental Hearing Board (EHB), which, after holding hearings upon a civil penalties complaint of the Pennsylvania Department of Environmental Resources (DER) and also upon a DER order appealed by Medusa, imposed violation penalties and a mandate of compliance with the DER order, as more fully discussed below.

Medusa owns and operates a cement manufacturing facility in York, Pennsylvania, consisting of four kilns with auxiliary equipment, producing portland cement by wet process.

In that process, limestone is ground in the presence of water to form a slurry which is introduced into the kilns and there subjected to heat, resulting in chemical and physical changes which form clinker, a rock-like material in the shape of small balls, which, upon emerging from each kiln, is cooled, mixed with other material and ground into the final form of cement.

Three of the kilns, the gray plant, date from 1955, 1956 and 1969; the fourth kiln, the white plant, began operation in 1963. Each kiln is presently equipped with electrostatic precipitators and an oil-fired burner for preheating the kiln before the introduction of the main heat source, consisting of coal.

Those oil-fired burners were installed in 1973, after DER, pursuant to a 1972 variance application of Medusa, granted Medusa a variance dated February 14, 1973, covering gray plant start-ups, gray plant coolers, white plant steam exhaust and certain fugitive emissions. The variance was requested, and was granted, to extend until December 18, 1973. Among other things, the variance order contained references to the installation of auxiliary heating systems, the activation of the electrostatic precipitators in start-up procedure and the requirement that all sources covered by the variance be brought into compliance on and after December 18, 1973. We will consider details of that variance order below.

On July 7, 1976, DER filed with the EHB the civil penalties complaint against Medusa. As amended on June 16, 1977 and again on October 27, 1977, that complaint sought penalties against Medusa under Section 9 of the Air Pollution Control Act, Act of January 8, 1960, P.L. (1959) 2119, *as amended,* 35 P.S. §4009,

with respect to five counts, the allegations of which can be summarized as follows:

Count I—hundreds of days of violations as to particulate matter from processes, 25 Pa. Code §123.13, and as to opacity standards, 25 Pa. Code §123.41, *during start-ups of kilns:*

Count II—twenty days of violations consisting of fugitive emissions contrary to 25 Pa. Code §123.1;

Count III—violation of the variance order with respect to the installation of auxiliary heating systems (subsequently not pressed by DER);

Count IV—violations of 25 Pa. Code §123.13, concerning particulate emissions from processes *during normal operations* (a charge subsequently dropped by DER); and

Count V—air pollution violations, of Section 8 of the Air Pollution Act, 35 P.S. §4008, and of 25 Pa. Code §121.7, contrary to standards in 25 Pa. Code §§131.2, 131.3.

In the above summary, the emphasis is that of the court. The noncompliance period alleged in the amended complaint extended from December 18, 1973 to October 1, 1977.

Medusa answered the complaint, and the parties exchanged petitions for discovery.

On August 17, 1977, DER issued the DER order which alleged violations as follows: (Numbers refer to the paragraphs of the order, and the emphasis is ours.)

4, 5, 6—uncontrolled emissions *"during start-ups* and reactivations" of the kilns, with precipitators not activated;

7, 8—air pollution contrary to ambient air standards as in 25 Pa. Code §§131.2, 131.3;

9, 10—emissions from gray plant kilns *"during normal operations"* with precipitators activated,

contrary to 25 Pa. Code §123.13 (charge subsequently dropped by DER);

11—violation of variance order through failure to install auxiliary heating system (subsequently not pressed by DER);

12—emissions constituting a public nuisance.

The DER order also commanded Medusa to Develop a comprehensive air pollution elimination plan to be submitted within three months, resubmitted within thirty days if not initially approved, and implemented within twenty-four months thereafter, or to cease operations within thirty days after a final disapproval of the plan.

Medusa appealed the DER order to the EHB, which agreed to consolidate the order and complaint for hearing. The DER agreed to postpone the mandates of its order until after the hearings, which began November 14, 1977 and ended December 7, 1977, resulting in a record which, as reproduced record alone, consists of approximately 1900 pages.

EHB issued its adjudication order August 23, 1978, which required Medusa to comply with the mandates of the DER order within ninety days and assessed civil penalties aggregating $215,500, broken down as follows:

| | |
|---|---:|
| Opacity violations, 25 Pa. Code §123.41, nineteen days at $500 per day | $ 9,500.00 |
| Fugitive emission violations, 25 Pa. Code §123.1, twenty days at $300 per day | $ 6,000.00 |
| Air pollution violations, 1000 days at $200 per day | $200,000.00 |
| | $215,500.00 |

The EHB assessed no penalty for the alleged variance violation with respect to auxiliary heat or with respect

to 25 Pa. Code §123.13, particulate emissions from processes (by weight). As noted above, DER dropped the charges as to violations during normal operations (complaint Count IV and order paragraphs 9, 10) "in view of all of the data available, including some questions as to the validity of the wet catch being included in those results." Upon so doing, DER counsel also announced that, aside from the fugitive emissions and air pollution charges, the opacity and variance charges related to *start-up* conditions.

As to the ninety-day compliance order, this court has granted a supersedeas.

With the variance violation charges (auxiliary heat)[1] and particulate emission charges under 25 Pa. Code §123.13 exonerated by the board and not appealed by DER, our discussion can be suitably organized by first covering Medusa's general claims and then dealing with the findings and conclusions as to opacity violations, fugitive emissions and air pollution charges, in that order.

### General Issues

Medusa's broadest issue is that it is a victim of discriminatory enforcement by DER, resulting in a denial of equal protection rights. *Yick Wo v. Hopkins,* 118 U.S. 356 (1886); *Commonwealth v. Lewis,* 443 Pa. 305, 279 A.2d 26 (1971), *cert. denied,* 404 U.S. 1003 (1971).

As a basis for a showing of discriminatory enforcement, Medusa points to: DER's resistance to Medusa's discovery requests before the EHB, on which the EHB never ruled; DER's concentration upon observation and testing of Medusa's plant, with little or no testing

---

[1] As noted above, DER also did not press the variance violation charges, dealing with auxiliary heat facilities (which are distinct from the oil-fired pre-heating burners.)

as to the other fifteen cement plants in the Commonwealth; DER's failure to file complaints against other cement companies, despite evidence submitted by Medusa in the EHB hearing (primarily by aerial photo) that other cement plants were emitting visible plumes from their stacks.

We must agree with the EHB that such evidence does not suggest the "discriminatory design" on which a finding of unequal enforcement is to be based. *Snowden v. Hughes*, 321 U.S. 1, 8 (1944). As pointed out by the Supreme Court in *Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 416, 319 A.2d 871, 884 (1974), an enforcement program must begin somewhere, and Medusa has not met its burden to show that it was wrongly singled out.

Medusa also claims, apparently under the heading of a due process violation, that it should be accorded a defense to all the charges by reason of the delay of DER in not commencing the complaint charges until July, 1976, to cover a period of alleged violations which began in December, 1973.

Although Medusa pointed out, with concurrence by the EHB, that at least five of Medusa's employees had become no longer available as witnesses, Medusa has suggested no legal basis for a statute of limitations or principle of laches in support of such a defense. We can find none and therefore reject Medusa's contention on this point.

### Opacity and Fugitive Emissions — Joint Issues

Medusa contends that the EHB should have dismissed all of the charges as to opacity and fugitive emission violations because of a denial of due process, in that, of more than 700 violations alleged, the department had given prompt notice of violation to Medusa only with respect to 19 opacity instances and 19 fugitive emission instances, thus giving Medusa, in

most instances, no contemporaneous opportunity to observe the violation or note operating conditions, in order to defend. *Western Alfalfa Corp. v. Air Pollution Variance Board,* 510 P.2d 907 (Col. App. 1973), *rev'd on other grounds, Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861 (1974), on remand, *Western Alfalfa Corp. v. Air Pollution Variance Board,* 534 P.2d 796 (Col. App. 1975), *aff'd., Air Pollution Variance Board v. Western Alfalfa Corp.,* 553 P.2d 811 (Col. S.Ct. 1976).

We must agree with counsel for DER that this issue seems to have been adequately covered by specific findings of the EHB that, of the thirty-four opacity violations substantiated, DER failed to give sufficient notice to Medusa as to fifteen of them, so that the EHB concluded that there were only nineteen violations subject to penalty — those as to which prompt notice had been given. Similarly, as to the fugitive emission violations, with DER evidence as to fifty-five violations on twenty different days, the EHB excluded the one fugitive emission violation as to which DER failed to give proper advice to the company.

The final joint issue raised by Medusa is its claim that the opacity and fugitive emission violations, as finally found by the EHB, were not supported by substantial evidence. Study of the record reveals no contradictory evidence offered by Medusa as to the particular dates on which the EHB settled.

With respect to Medusa's claims as to the technical bases for the violations found — concerning opacity reading procedure, observation procedure, observation position and viewpoint, and similar claims — we find no evidence which would cause us to disregard and displace the expertise of the EHB on these points. In addition, concerning eleven days of fugitive emissions violations as to which Medusa claims no evidence ex-

isted, we note that they do not appear to be among the dates identifiable as those found by the EHB to constitute violations; apparently they represent dates as to which DER did not press its allegations.

### Opacity Issues

As emphasized above in our summary of the allegations in DER's order and complaint, the opacity violation charges, at least, are confined to start-up conditions of the kilns and are not related to normal operations conditions.

Hence, one of Medusa's defenses with respect to those opacity violations is based upon paragraph (f) of the variance order, which provides that Medusa shall:

> (f) on and after September 1, 1973, activate its electrostatic precipitators not later than two minutes after combustible gases have been purged from the kiln exhaust system following ignition of the oil-fired kiln start-up burners....

The ignition of the oil-fired kiln start-up burners precedes the introduction of the coal-fueled heat in the kilns, and both heat sources produce combustible gases which, as the EHB expressly found, would produce dangerous explosions if the electrostatic precipitators were energized before the purging of such gases. Most, if not all, of the illegal stack emissions at issue in this case emerge during the time that the electrostatic precipitators are thus de-energized during start-up. Accordingly, Medusa points to that paragraph (f) of the variance order as constituting an acknowledgement by DER that emission control by precipitators is very much contraindicated during such a status. DER replies, in part, that the quoted variance paragraph is intended to authorize the de-energizing of the precipitators only until two minutes after the purging of the combustible gases generated by the oil-fired burner, and that no authorization to turn off the

precipitators in the presence of combustible gases from the coal fuel is intended. However the EHB adjudication, by confirming the definite danger of the latter condition, appears to support Medusa's interpretation.

Nevertheless, even with that interpretation, the EHB's rejection of this defense must be affirmed because the variance terms are such that no exemption can extend beyond the December 18, 1973 termination date of the variance. The variance order, in paragraph (b), specifically provides that Medusa shall:

> (b)  On and after December 18, 1973, operate all sources ... in such a manner as to maintain the emissions of particulate to within the limits specified in sections 123.1, 123.2, 123.13 and 123.41 of the Rules and Regulations....

Thus, that variance termination provision, expressly embracing 25 Pa. Code §123.41 governing opacity violations, eliminates the variance authorization as a defense after December 18, 1973, and Medusa has sought no extension of any aspect of it, despite the technology-forcing impact of the quoted provisions, as recognized by the EHB.

Medusa's next claim is that a criminal action brought by DER against Medusa for alleged opacity violations on April 16, 1974 and June 13, 1974, as to which Medusa was acquitted, has the effect of providing a defense of collateral estoppel, election of remedies or laches. Because neither of those 1974 dates are among the opacity violations settled upon by the EHB, we may dismiss that claim without further comment.

Finally, as to the opacity violations, however, we must conclude that at least some of the nineteen days of violation have not been clearly brought within the compass of the opacity charges made by DER in the complaint and DER order. As set forth above, DER has placed the opacity violation charges exclusively

within the context of start-up conditions, but the EHB adjudication indicates that an undetermined number of the nineteen days of violation involved malfunction conditions apart from start-ups and therefore within the scope of "normal operations." The EHB explicitly found, in Finding No. 15, that there were thirty-four separate opacity violations connected with "either a start-up or a precipitator malfunction." The EHB's discussion further breaks that figure down by stating that opacity violations were observed thirteen times in connection with start-ups and twenty-one times where malfunctions were involved. In settling upon the nineteen days of opacity violations meriting a penalty (because DER gave proper notice), the EHB failed to find that all of those nineteen days included violations related to start-ups as charged in DER's order and complaint, against which Medusa had to be prepared to defend. It thus appears that six or more of the violations (or days of such violations) were related to malfunctions rather than start-up conditions.

We cannot accept DER's ingenious argument that the occurrence of a malfunction takes the situation out of the "normal operations" mode, based on the idea that a malfunction is necessarily an abnormality; DER's charges expressly related the opacity violations to start-up conditions, not to conditions "other than normal operations."

Therefore, with respect to the opacity violation conclusions and penalties, we must remand to the EHB with a direction to make findings as to how many of the nineteen days of opacity violations (as to which proper notice was given) included violations related to start-up conditions. If necessary, the EHB should recompute the $500 per day penalty on the basis of the number of days so found.[2]

---

[2]Our labored attempt at reviewing the briefs and record to compare start-up violation dates with malfunction emission dates,

## *Fugitivè Emissions Issues*

Under this heading, Medusa first argues that a violation cannot be found with respect to the general prohibition, under 25 Pa. Code §123.1, of "the emission into the outdoor atmosphere of any fugitive air contaminant" without reference to certain specific standards stated in 25 Pa. Code §123.2 relating to "fugitive particulate matter."

We must disagree because a careful reading of the two regulation sections indicates that, for the sources involved here, a violation may be based upon §123.1 alone.

That section prohibits the emission of *any* "fugitive air contaminant from any source", and thus condemns at the outset *all* fugitive emissions, but the section also spells out nine sources—none of which are involved here— as being expressly excluded from the coverage of §123.1; the nine exemptions are listed in §123.1(a)(1)-(9). When we turn to §123.2, we see that it deals only with those nine sources exempted from the preceding section; §123.2 embraces only the "sources specified in §123.1(a)(1)-(9)" and makes the emission of "fugitive particulate matter" from such otherwise exempted sources a violation if either of two additional stated conditions are met. Thus, the latter section deals with nine categories excluded from the former section (and only with particulate matter, not every type of fugitive emission from those nine sources).

Therefore the two sections do not overlap, and, accordingly, either one can stand alone as a basis for a

---

within the group of dates as to which proper notice was given, has suggested that at least 4 of the 19 days may have involved only malfunctions. Even more strongly, however, our effort suggests that we leave such a re-analysis to the expertise of the specialized agency.

violation. *See Department of Environmental Resources v. Locust Point Quarries, Inc.*, 483 Pa. 350, 396 A.2d 1205 (1979), in which the Pennsylvania Supreme Court held that 25 Pa. Code §123.1 can stand alone, independently of 25 Pa. Code §123.11; although §123.2 was not argued there, the case nevertheless indicates that §123.1 can serve as an independent basis for determination of a violation.

Moreover, we find no basis on which to decide that the EHB erred in reaching conclusions as to fugitive emission violations, which necessarily import its coordinate conclusion that Medusa's expert evidence had failed to disprove a relationship between the fugitive emissions charged under 25 Pa. Code §123.1 and the lawful goals of air pollution control *Locust Point, supra.*

In addition, EHB's parenthetical comment, that Medusa did not avail itself of the "minor significance" exemption in 25 Pa. Code §123.1(9), was fair and legitimate; that exception existed substantively throughout the time period involved here, and the fact that procedural provisions were added to that subsection by amendment in 1977 is of no materiality.

We therefore find that the EHB's penalizing of fugitive emissions was justified upon the evidence and upon the law.

However, the EHB adjudication contains a minor inconsistency which causes us to question the number of days of fugitive emission violations — twenty — on which the EHB settled. The EHB's Finding No. 44 provides support for fifty-five separate fugitive emission violations on twenty different days, but Finding No. 45 notes that, as to one of those violations, DER did not give Medusa proper notice. Because the related EHB Conclusion No. 6 also refers to nineteen (and not twenty) days of fugitive emission violations, we must observe that the findings and conclusions are not con-

sistent in supporting the penalty order which assesses a $6,000 penalty for fugitive emissions on the basis of twenty days at $300 per day. We are required to remand this point also for correction or clarification as to the one-day difference.

### Air Pollution Issues

The major penalty assessed by the EHB, $200,000, was based upon a finding of ambient air pollution violations for a period of one thousand days. Compliance with the DER abatement order mandate, as affirmed by the EHB, that Medusa develop a comprehensive air pollution elimination plan, is intertwined with the air pollution issues.

As to these issues, Medusa, following oral argument of this appeal, filed an Application for Remand to Consider After-Discovered Evidence. Pursuant to a hearing held on that application, a separate order of court, of this same date, also remands those issues, for reconsideration by the EHB in the Light of the evidence described in the application.

It is to be expected that the EHB will coordinate its reconsideration under that separate order with the matters remanded hereunder.

### ORDER

Now, this 23rd day of May, 1980, the order of the Environmental Hearing Board dated August 23, 1978 is reversed and this case is remanded to that Board for reconsideration of the violations and penalties as to 25 Pa. Code §123.41, opacity, and of the violations and penalties as to 25 Pa. Code §123.1, fugitive emissions, in accordance with the opinion herein. The remaining issues herein having also been remanded by separate order of this date, the order of supersedeas of this court, dated November 30, 1978, is extended until further notice.

President Judge Bowman did not participate in the decision in this case.

Judge DiSalle did not participate in the decision in this case.