No. 55,087

No. 55,352

PORK MOTEL, CORP., *Appellant*, v. THE KANSAS DEPARTMENT OF
HEALTH AND ENVIRONMENT, *Appellee*.

(673 P.2d 1126)

Opinion filed December 2, 1983.

Robert S. Jones, of Norton, Wasserman, Jones & Kelly, of Salina, argued the cause, and Norman R. Kelly, of the same firm, was with him on the briefs for the appellant.

Emily E. Cameron and L. Patricia Casey, of Topeka, argued the cause and were on the briefs for the appellee.

David K. Palmer, of Beving, Swanson & Forrest, P.C., of Des Moines, Iowa, was on the amicus curiae brief for the National Pork Producers Council, Kansas Livestock Association, Kansas Pork Producers Association, and the National Agricultural Legal Fund.

The opinion of the court was delivered by

LOCKETT, J.: Case No. 55,087 is an appeal from an administrative order issued by the secretary of the Kansas Department of Health and Environment. On July 17, 1981, the secretary issued ex parte findings and conclusions regarding alleged violations by Pork Motel, Corp. of certain conditions made a part of a water pollution (sewage discharge) permit previously issued by the Kansas Department of Health and Environment (KDHE). This ex parte order was appealed to the secretary and a full hearing was held. Thereafter, the secretary issued an order and this was then appealed to the Saline County District Court. Pork Motel,

Corp. appealed from the district court's affirmation of the secretary's previous order.

Case No. 55,352 is an appeal from a Memorandum Decision of the Saline County District Court finding Pork Motel, Corp. to be in contempt of its order in 55,087, and fining Pork Motel, Corp. and ordering it to do certain acts and reduce the head count at appellant's swine facility. The appeals in 55,087 and 55,352 have been consolidated.

Pork Motel is a swine finishing facility located in the Saline river valley approximately ten miles northwest of Salina, Kansas. When constructed there were approximately 40 families living within a five-mile radius of Pork Motel. Several dwellings are within the one-quarter to one-half mile range of the feed lot. The facility has the capacity of feeding 4,400 swine.

Plans for the construction of the facility were initiated in September, 1974. An engineering firm was engaged, and plans and specifications were submitted to the KDHE. After the facility began operation, odor complaints were received by KDHE from residents located in close proximity to Pork Motel.

On May 6, 1977, Dwight Metzler, Secretary of KDHE, issued an order setting out steps to be taken to abate the odor nuisance. Secretary Metzler modified his order on July 28, 1977, following a public hearing.

The modified order was appealed to the district court in Saline County, Kansas. Judge Richard Wahl approved the modified order and ordered that Pork Motel comply with it. No further appeal was taken at that time.

On March 28, 1978, Pork Motel, pursuant to the secretary's order of July 28, 1977, submitted for approval a plan of operation for its facility. That plan of operation was approved by KDHE.

The Water Pollution Control Permit for Pork Motel came up for renewal in April of 1979. Following another public hearing, a permit for a nondischarging facility was issued May 26, 1979, to be effective June 1, 1979, for a period of five years. The permit contained conditions concerning pumping of retention lagoons, keeping sufficient space in lagoons for rainfall and on-site testing for dissolved oxygen after rain.

The June 1, 1979, permit also contained special permit limitations and conditions relating to the waste treatment facilities at Pork Motel. The special conditions required the resumption of the feeding operation would be by incremental phases, begin-

ning with 1,100 units, moving to 2,200 units and so forth until full capacity of 4,400 units was reached. Each incremental phase was to be proposed by Pork Motel and approved by KDHE. The special conditions and limitations were imposed to assure that significant nuisance odors were controlled. The permit stated if the plan of operation set forth by Pork Motel and compliance with permit limitations and conditions failed to prevent and control significant nuisance odors, the Pork Motel would have to discontinue receiving new animals until alternative measures could be proposed and approved.

Due to economic conditions existing, Pork Motel did not actually undertake to resume feeding operations until September, 1980. In December, 1980, approval was granted by KDHE allowing Pork Motel to proceed with the second phase expanding to 2,200 animals. Certain modifications in the waste treatment facility had been proposed by Pork Motel. Specifically, concrete sedimentation pits were being constructed to trap manure and prevent it from entering the waste treatment lagoon system.

On March 24, 1981, a new Water Pollution Permit was issued to Pork Motel. The new permit took into account the addition of the concrete sedimentation pits in the facility's waste treatment operational plan. Again, specific limitations and special conditions were set out in the permit. In general, those required Pork Motel to:

1.  Pump the concrete sedimentation manure pits following every significant rainfall and have the contents hauled to cropland by slurry wagon.

2.  Provide adequate storage facilities for rainfall occurrences.

3.  Provide for dewatering and disposal activities for the waste retention structures.

4.  Provide for an incremental resumption of the feeding operation, with the notation that phases one and two were completed under the previous permit and that phase three would be more than 3,300 units, with the fourth phase of 4,400 units. Again, it was set out that each phase must be completed to the full satisfaction of KDHE.

5.  Require that on-site testing for dissolved oxygen content in lagoon cell number one be made by the use of a dissolved oxygen probe for three days following rainfall events, or as

otherwise specified by KDHE. The permittee was also required to keep information, such as rainfall records and temperatures, with all data being recorded and available for submission to the department upon request.

The new permit, issued March 24, 1981, also set out that the permittee would be required to discontinue receiving new animals in the event that the operational plan and compliance with the permit failed to control significant nuisance odors. Pork Motel was given permission and authority to increase the maximum capacity to 2,750 units (animals).

Finally, after receiving further numerous odor complaints from area residents, Joseph Harkins, secretary of the department, issued an order on July 17, 1981, requiring Pork Motel to:

1.   Stop receiving animals at the facility until the units were reduced to 2,200 and to maintain 2,200 units as the maximum allowable level.

2.   Obtain and maintain the necessary equipment to monitor dissolved oxygen levels within ten days from the receipt of the order.

3.   Record daily the liquid level in each manure pit, the dissolved oxygen profile of each lagoon and report the same to the director of the Division of Environment by no later than the end of the following week in which the recordings were made.

4.   Submit a plan for dewatering the manure pit to the director of the Division of Environment within 15 days following the receipt of the order.

The ex parte order was appealed to the secretary and a full hearing was held. After the hearing the secretary issued an order which Pork Motel appealed to the Saline County District Court. The district court affirmed the secretary's order and Pork Motel appealed.

Administrative agencies are creatures of statute and their power is dependent upon authorizing statutes, therefore any exercise of authority claimed by the agency must come from within the statutes. There is no general or common law power that can be exercised by an administrative agency.

Rules or regulations of an administrative agency, to be valid, must be within the statutory authority conferred upon the agency. Those rules or regulations that go beyond the authority authorized, which violate the statute, or are inconsistent with the

statutory power of the agency have been found void. Administrative rules and regulations to be valid must be appropriate, reasonable and not inconsistent with the law.

The legislature has by statute charged the secretary of KDHE with specific duties to protect the health and environment of the citizens of this state. Two areas in which the legislature has stated the public policy of the state and granted authority to the secretary of KDHE to carry out that policy are: (1) protecting our water supply and controlling discharge of sewage into the water supply (K.S.A. 65-161 *et seq.*), and (2) achieving and maintaining levels of air quality which protect human health and safety (K.S.A. 65-3001 *et seq.*). To carry out the legislative policy, the secretary of KDHE has been granted the authority to issue permits regarding water supply and the discharging of sewage into the water supply, and allowed to set conditions to protect and maintain certain levels of air quality.

The secretary has authority to issue a water and sewage permit when, in the secretary's opinion, the general interest of the public health would be subserved thereby or the discharge of such sewage would not detract from the quality of the water of this state for the beneficial use for domestic or public water supply, agriculture needs, industrial needs, or other beneficial use. The secretary shall issue a permit, stipulate in the permit the conditions upon which such discharge shall be permitted and require such treatment of sewage as he determines necessary to protect beneficial uses of the waters of the state. K.S.A. 65-165.

As to air pollution, the public policy of the state is to achieve and maintain levels of air quality which protect human health and safety to the greatest degree practicable. In addition, the public policy is to foster the comfort and convenience of the state's inhabitants, promote economic and social development, and facilitate the enjoyment of the natural attractions of the state. K.S.A. 65-3001. To carry out the responsibility for air quality and pollution control, the secretary has power to adopt, amend and repeal rules and regulations implementing and consistent with the act, issue such orders as may be necessary to effectuate the purpose of the act, enforce such orders by appropriate administrative and judicial proceedings and establish ambient air quality standards. K.S.A. 65-3005. Air pollution includes the presence in

the outdoor atmosphere of odorous substances in such quantities and duration as is, or tends significantly to be, injurious to human health or welfare, or property, or would unreasonably interfere with the enjoyment of life or property. K.S.A. 65-3002(*a*) and (*c*).

Pork Motel's first contention is that the secretary of KDHE did not have authority to incorporate air pollution conditions within a water pollution permit. We do not agree.

Given the legislature's grant of power to KDHE under K.S.A. 1982 Supp. 65-101, General Powers and Functions; K.S.A. 65-161 *et seq.*, Water Supply and Sewage; K.S.A. 65-3001 *et seq.*, Air Quality Control; and K.S.A. 65-3401 *et seq.*, Solid and Hazardous Waste, it is clear the legislature intended to place the responsibility for the regulation of solid waste and air pollution arising from the operation of feed lots affecting both water supply and air quality under the control of the secretary of KDHE.

To carry out the public policy to protect the air quality, the secretary may impose certain conditions upon the methods of operation of Pork Motel. The Air Quality Control Act contains no statutory provision for the secretary to issue permits restricting or allowing Pork Motel to operate under the Act. Under the Air Quality Control Act, the secretary of KDHE has limited authority to issue permits for the installation or alteration of any machine, equipment, device or other article which may cause or contribute to air pollution. Such permits may be issued by the secretary after balancing public policy to protect the air quality against the promotion of economic and social development of the state.

Enforcement of remedies allowed under the Air Quality Control Act is after the fact. Whenever the secretary has reason to believe there has been a violation of the Act, he may cause written notice to be served upon the alleged offending party. The notice shall specify the provision of the Act, rule or regulation alleged to have been violated and the facts constituting such alleged violation and may include an order that necessary corrective action be taken within a reasonable time. The right to a hearing regarding the alleged violations and corrective action required by the secretary is contained within the Act. K.S.A. 65-3011.

As indication of overall policy, a departmental note preceding Part 1 of K.A.R. agency 28, art. 19 (1978) entitled Ambient Air

Quality Standards and Air Pollution Control Regulations (revoked 1981) stated:

"Note: In order to restrict the necessity of multiple permits or licenses for a single facility or installation, the review of facilities or installations within the environmental responsibilities of the state department of health will, where appropriate, be considered from the standpoint of the total environment. The primary function of the facility or installation will be determined by department staff and where possible a single permit or license will be issued for the total facility or installation which may include considerations in the air quality, water quality, solid waste, and radiation protection program areas."

Pork Motel contends that the secretary must ignore air pollution while considering water pollution permits. Here the secretary has determined that water pollution is the source of the air pollution. Logic demands and the law implies when a water pollution permit is granted, it will contain the proper limitations and conditions so that operation under the permit will not cause pollution to another portion of our environment under the secretary's jurisdiction.

Pork Motel claims the secretary of KDHE acted arbitrarily, capriciously and unreasonably by including air pollution conditions within a water pollution permit and issuing the July 17, 1981, order.

The court's scope of review in determining whether or not the secretary of KDHE acted fraudulently, arbitrarily or capriciously is limited. *State Corporation Com'n of Kansas v. United States*, 184 F. Supp. 691 (D. Kan. 1959). The arbitrary and capricious test relates to whether a particular action should have been taken or is justified, such as the reasonableness of an agency's exercise of discretion in reaching a determination or whether the agency's action is without foundation in fact.

According to an engineer testifying as an expert witness, the purpose of the secretary's operational plan was to insure that the lagoons were aerobic, not anaerobic:

"The differences in the aerobic and anaerobic lagoons are in the types of organisms that are used to break down the organic material. In the aerobic lagoon, there is oxygen present all of the time. The organisms generally will break down the [organic material] without the production of offensive odors or offensive gasses. In the anaerobic system, there is no free oxygen present in the lagoon. The organisms obtain most of their energy directly from the breakdown of the organic material."

Gasses and very offensive odors are produced when a lagoon is anaerobic.

The secretary required an operational plan to insure sufficient oxygen was available for the treatment of the waste. The plan included: (1) a cleaning schedule, (2) a certain number of operating aerators to provide sufficient oxygen for mixing with the liquid waste, (3) testing to determine the oxygen content of the waste material, and (4) manure pits to insure waste solids settled for easier cleaning. The plan was developed because inspections had revealed there was no significant odor from the feeding floors which had been regularly cleaned. The offensive odors were anaerobic in nature, generated by the manure pits and lagoons.

The conditions placed within the water pollution permit were designed to prevent and control odors emanating from the facilities. The trial court found that the secretary's order was supported by substantial evidence and thus not arbitrary. A district court and this court cannot substitute their judgment for that of an administrative board. On appeal, the court is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by the evidence, and (3) the tribunal's action was within the scope of its authority. *Hemry v. State Board of Pharmacy*, 232 Kan. 83, 652 P.2d 670 (1982). The order has a presumption of validity on review and the review is limited to determining the lawfulness and reasonableness of the order.

Clearly the evidence established in this case that the odor has a significant effect on the health and the enjoyment of life or property of Pork Motel's neighbors. The secretary of KDHE has statutory authority to control both water and air pollution. It would not be logical for the secretary to issue a water pollution control permit without incorporating the necessary permit limitations and conditions to prevent air pollution.

Pork Motel further contends that the procedures followed by the secretary of KDHE denied it procedural and substantive due process. Pork Motel particularly objects to the fact that the hearing officer at the administrative hearing was an employee of KDHE.

Pork Motel claims the appeal to the district court arose from an order made by the secretary of KDHE based on certain conclusions from an investigative report submitted by the staff of the

department. The hearing officer made certain findings of fact and conclusions for the secretary, who had originally ordered the hearing. The secretary then made a decision on the merits of a hearing officer's decision authorized by the secretary's original order.

There is no doubt that the hearing conducted by the hearing officer employed by KDHE was quasi-judicial in nature. Quasi-judicial is a term applied to an officer who is empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of a general nature. *Schulze v. Board of Education,* 221 Kan. 351, Syl. ¶ 4, 559 P.2d 367 (1977). Pork Motel claims denial of its fundamental requisite of due process—notice and opportunity for a full and complete hearing. It claims the fact that the hearing officer was an employee of the KDHE violated appellant's due process right to a hearing before an impartial examiner. *Wong Yang Sung v. McGrath,* 339 U.S. 33, 94 L.Ed. 616, 70 S.Ct. 445 (1950), which appellant cites to support its contention that appointing Patrick McCool, an engineer with the Division of Environment, as hearing officer in the instant case violated due process, was a decision based on substantially different facts than are present in this case. The crucial distinction is that in that case the hearing officer who made the decision was the actual investigator and prosecutor in the case as well. The thrust of the *Wong Yang Sung* decision was that the functions of investigating and judging and/or prosecuting and judging should not be visited in the same person, not that the different functions could not be performed within the same administrative agency. *Wong Yang Sung v. McGrath,* 339 U.S. 33. In that case the Supreme Court applied the standards of the Administrative Procedure Act, which appellant also relies on to support his position. The APA does provide for the separation of judicial functions from prosecuting/investigative functions. The APA says specifically: "An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, *in that or a factually related case,* participate or advise in the decision." 5 U.S.C. § 554 (d) (1982), emphasis supplied. The APA separation of functions doctrine requires only that the prosecutor and the adjudicator each be responsible to the agency head by a separate

chain of authority. *Columbia Research Corporation v. Schaffer,* 256 F.2d 677 (2nd Cir. 1958).

The KDHE initiated proceedings and investigated complaints about Pork Motel, and made the final administrative adjudication of whether Pork Motel was violating Kansas' environmental pollution laws. The legislature gave KDHE the power to do so. K.S.A. 65-161 *et seq.*, and K.S.A. 65-3001 *et seq.* The United States Supreme Court has recently held that the combination of investigating and judging functions in an agency does not violate due process, *Withrow v. Larkin,* 421 U.S. 35, 43 L.Ed.2d 712, 95 S.Ct. 1456 (1975), and there is no question of the power of the legislature to delegate such a dual role to an agency. *In re Larsen,* 17 N.J. Super. 564, 86 A.2d 430 (1952). Thus, the only due process issue left is whether Patrick McCool's role as a hearing officer was somehow too closely connected with another role as a prosecutor or investigator.

The facts show quite the opposite. Mr. McCool was not in any way connected with the department's investigation of Pork Motel. He had absolutely nothing to do with the department's decision to institute administrative proceedings against Pork Motel. At the hearing, he did not make any evidentiary rulings. His actual function was much more that of a technical advisor to the other hearing officer, to assist in the explanation of exhibits and expert testimony. KDHE met the requirements of fundamental fairness set forth by this court in *Coats v. U.S.D. No. 353,* 233 Kan. 394, 662 P.2d 1279 (1983), by appointing a lawyer outside of KDHE to hear the case and by appointing a KDHE engineer, who had no connection with the Pork Motel investigation, to be his technical advisor.

There is a strong presumption of regularity in administrative proceedings. *Sutherland v. Ferguson,* 194 Kan. 35, 39, 397 P.2d 335 (1964). Pork Motel has not established in the administrative record that KDHE denied it due process of law.

Pork Motel claims it was denied equal protection of the law by unique and unequal application of the law by KDHE; that KDHE singularly imposes on Pork Motel its rules and regulations in a malicious and confiscatory manner, thereby violating Pork Motel's constitutional rights.

An individual may suffer and be deprived of his equal protection by the exercise of regulatory authority by administrative agencies. Some examples are: (1) an improper delegation of

legislative power to an administrative agency (*State, ex rel., v. Hines*, 163 Kan. 300, 182 P.2d 865 [1947]); (2) failure of the legislature to fix reasonable and definite standards which govern the exercise of such authority by the administrative agency (*State, ex rel., v. Hines*, 163 Kan. 300); and (3) selective enforcement in an unconstitutional manner of laws intended to be discriminatorily enforced (see generally *McGowan v. Maryland*, 366 U.S. 420, 6 L.Ed.2d 393, 81 S.Ct. 1101 [1961]).

The record indicates that KDHE investigated similar complaints at other locations, that other facilities were regularly inspected, and that KDHE required monitoring of oxygen levels at other facilities and pumping of other waste disposal lagoons and pits on a regular basis. Complaints about Pork Motel were handled no differently than complaints about other feedlots.

However, even if KDHE, as Pork Motel contends, "singled out" Pork Motel for selective enforcement while other agricultural facilities within the state were not all required to perform the same functions with respect to odor control, undergo weekly inspections, or conform to special conditions contained in their permits, it would not necessarily be a denial of equal protection to Pork Motel. The Supreme Court of the United States has said that failure to proceed against all alleged violators of a law does not preclude an administrative agency from enforcing the law against one violator. *Moog Industries, Inc. v. F.T.C.*, 355 U.S. 411, 2 L.Ed.2d 370, 78 S.Ct. 377 (1958). The issue in that case was whether to postpone the operation of a valid cease and desist order of the Federal Trade Commission against a single firm until similar orders were issued against the firm's competitors, who were also violating the law. The Supreme Court refused to vacate the order, saying that the decision to prosecute one, not all, violators of the statute was purely within the expertise of the commission. "Furthermore, the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries, Inc., v. F.T.C.*, 355 U.S. at 413.

A recent Kansas case illustrates that selective enforcement of an environmental pollution law does not necessarily violate the equal protection clause. *United States v. Hercules, Inc., Sun-*

*flower Army Am. Pl.,* 335 F. Supp. 102 (D. Kan. 1971). In *Hercules,* an action was brought against a corporation for depositing refuse in navigable waters. The defendant corporation brought a motion to dismiss, alleging that the prosecution was an attempt to selectively and discriminatorily enforce the law. The defendant also asked for a hearing to show that there were hundreds of industries in the area discharging large quantities of waste into the water. The court said that mere laxity in the prior enforcement of the law was not a denial of equal protection, and it is no defense to say that others have not been prosecuted. The court also said that even an unequal enforcement of a valid state law is not a denial of equal protection unless the unequal enforcement is the result of "arbitrary and invidious discrimination."

Other state courts have specifically held that enforcing environmental laws against one environmental polluter, without proceeding against every polluter, does not constitute a denial of equal protection. *Medusa Corp. v. D. E. R.,* 51 Pa. Commw. 520, 415 A.2d 105 (1980); *Commonwealth v. Barnes & Tucker Co.,* 455 Pa. 392, 319 A.2d 871 (1974). In the *Medusa* case the owner of a cement manufacturing plant appealed to the district court for review of an ·order of the Environmental Hearing Board. The order imposed penalties for violation of air pollution standards and mandated Medusa to develop a comprehensive plan to reduce its air pollution. Medusa charged that the Pennsylvania Department of Natural Resources had singled out its operation for discriminatory enforcement of air pollution control laws, thereby denying it equal protection under the law. In support of its allegation of discriminatory enforcement, Medusa pointed out that the Department of Natural Resources had concentrated on observation and testing of Medusa's plant, with little or no testing of the other fifteen plants in the state, and that the department had failed to file complaints against other cement companies despite evidence (photographs) that they were also polluting the air. The court found that such evidence, even if substantiated, did not suggest a "discriminatory design" on which to base a finding of unequal protection. The court stated: "[A]n enforcement program must begin somewhere, and Medusa has not met its burden to show that it was wrongly singled out." *Medusa,* 51 Pa. Commw. at 526.

The court in *Medusa* was applying two very important concepts of equal protection law. One is that merely because a state applies a statute to one person and not to another does not in itself constitute a denial of equal protection. Second, it must be shown as well that there was an element of intentional or purposeful discrimination. A discriminatory purpose is not presumed; there must be some evidence showing clear and purposeful discrimination. *Snowden v. Hughes,* 321 U.S. 1, 8, 88 L.Ed. 497, 64 S.Ct. 397 (1943); *Deerfield Hutterian Ass'n v. Ipswich Bd. of Ed.,* 468 F. Supp. 1219 (D.S.D. 1979); *United States v. Maplewood Poultry Company,* 320 F. Supp. 1395 (D. Maine 1970). In the *Maplewood* case, the defendants were two corporations indicted for discharging refuse into a bay. The defendants asserted that they were denied due process and equal protection because they were the only two firms selected for prosecution. They had established at a hearing that there were numerous other sources of industrial pollution in the bay. The court said that the failure to prosecute other violators was not enough to establish a denial of equal protection. To do that the defendants would have to show that their prosecution was deliberately based on an arbitrary, illegal or otherwise unjustifiable standard.

Pork Motel's claim that it was denied equal protection of the law by unique and unequal application of the law is without merit.

Pork Motel claims it has reasonably complied with the conditions imposed by KDHE; that KDHE failed to conduct proper inspections when determining whether Pork Motel had complied with conditions of operation imposed by KDHE. We do not agree.

In reviewing a district court's judgment, an appellate court must first determine whether the district court observed the requirements and restrictions placed upon it and then make the same review of the administrative tribunal's action as does the district court. *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. 169, 630 P.2d 1131 (1981). The district court and this court are restricted to determining whether the administrative order is supported by substantial evidence. Here there is substantial evidence that Pork Motel failed to comply with the conditions of operations imposed by KDHE in the permit.

The trial court on September 15, 1982, affirmed the secretary's

January 8, 1982, order. The trial court ordered compliance with the secretary's schedule to reduce odor to commence upon the date of filing the court's Memorandum Decision. October 14, 1982, Pork Motel appealed the trial court's September 15, 1982, order.

October 12, 1982, KDHE officials inspected Pork Motel's facilities. The officials determined Pork Motel was not complying with the trial court's order to ·implement the secretary's schedule. On November 16, 1982, the attorney general acting for KDHE filed with the trial court a motion to appear and show cause alleging Pork Motel to be guilty of indirect contempt of the district court's September 15, 1982, order. December 3, 1982, the district court issued an Order to Appear and Show Cause to Pork Motel. The order was mailed to Pork Motel and not served by the sheriff or a court-appointed individual.

January 4, 1983, a hearing in Case No. 55,352 was held in Lincoln, Kansas, on the Order to Appear and Show Cause. At the conclusion of the hearing, the district court found Pork Motel to be in contempt of the previous order of the court. On January 13, 1983, the court issued its memorandum decision finding Pork Motel in contempt. The court set a $500.00 per day fine that was to be imposed each day Pork Motel was not in compliance with the court's original order. In addition, the court ordered the Pork Motel to reduce the hog population to not more than 2,200 animals by March 1, 1983. The court further directed should Pork Motel fail to reduce the hog population as ordered by March 1, 1983, then an additional fine of $1,000.00 per day be imposed each day thereafter until Pork Motel complied with the hog population reduction order. If Pork Motel was not in full compliance with all orders of the court, then on April 5, 1983, a hearing would be held to determine whether or not the court should order Pork Motel to cease all operations. Pork Motel appealed.

Pork Motel contends the manner in which the order to appear and show cause was served upon it was fatally flawed. The order was served by mail. K.S.A. 20-1204a(a) and (b) provides:

"When an order in a civil action has been entered, the court that rendered the same may order a person alleged to be guilty of indirect contempt of such order to appear and show cause why such person should not be held in contempt if there is filed a motion requesting an order to appear and show cause which is

accompanied by an affidavit specifically setting forth the facts constituting the alleged violation.

"Except as provided in subsection (e), the order to appear and show cause shall be served upon the party allegedly in contempt by the sheriff or some other person appointed by the court for such purpose. Such order shall state the time and place where the person is to appear and shall be accompanied by a copy of the affidavit provided for in subsection (a). The court shall hear the matter at the time specified in the order, and upon proper showing, may extend the time so as to give the accused a reasonable opportunity to purge himself or herself of the contempt. If the court determines that a person is guilty of contempt such person shall be punished as the court shall direct."

Pork Motel admitted the motion and order mailed to Pork Motel were received by Frank Norton; that Frank Norton was a party and had acted as counsel for Pork Motel prior to receiving the motion and order to show cause. Prior to the hearing of the Order to Show Cause on January 4, 1983, Pork Motel objected to the sufficiency of the service, and reserved the question of jurisdiction for the court to proceed with the contempt hearing. The following conversation between the court and defendant's counsel occurred:

"THE COURT:   Do you deny receiving it?
"MR. KELLY:   No, Your Honor.
"THE COURT:   So it's really a moot question.
"MR. KELLY:   We just want to raise it. *Yes.*
"THE COURT:   But being here you also waive it.
"MR. KELLY:   Well, really *I just said we waived it.*
"THE COURT:   Yes. Proceed." (Emphasis supplied.)

This sentence was corrected on March 10, 1983, to read: "Mr. Kelly: Well, really *I just said we raised it."* (Emphasis supplied.)

KDHE relies on the service method of K.S.A. 60-205(b) which provides in part:

"Whenever under this article service is required or permitted to be made upon a party represented by an attorney the service shall be made upon the attorney unless service upon the party himself is ordered by the court. Service upon the attorney or upon a party shall be made by delivering a copy to him or by mailing it to him at his last known address or, if no address is known, by leaving it with the clerk of the court."

The methods of service under K.S.A. 60-205 are alternative to, and do not restrict, different methods of service provided by law. The Rules of Civil Procedure are to be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding. K.S.A. 60-102. In any method of serving process set forth in Article 3 of Chapter 60, substantial compli-

ance therewith shall effect valid service of process if the court finds that, notwithstanding some irregularity or omission, the party served was made aware that an action or proceeding was pending in a specified court in which his or her person, status or property were subject to being affected. K.S.A. 60-204.

Use of K.S.A. 60-205, service and filing of pleading and other papers, has not been limited to Chapter 60 actions. Although K.S.A. 60-205(e) is contained in the Code of Civil Procedure, it has been extended to criminal proceedings to allow filing of pleadings and other papers with the court where there is no provision in the Criminal Code of Procedure to the contrary. *State ex rel. Owens v. Hodge,* 230 Kan. 804, 808, 641 P.2d 399 (1982).

Article 12 of Chapter 20 contains the provision for service upon a party alleged to be guilty of contempt. Except in divorce cases, the order to appear and show cause *shall* be served upon the party allegedly in contempt by the sheriff or some other person appointed by the court for such purpose. K.S.A. 20-1204a(b). Chapter 60's requirement that the civil procedure be liberally construed is not contained within Chapter 20. In addition, Chapter 20 does not provide, as does Chapter 60, that substantial compliance of service procedure will effect valid service if the party is made aware that an action or proceeding was pending in a specific court in which that party's status or property is subject to being affected.

The power to punish for contempt of court does not arise from statutory legislative action, but is inherent in the court itself. *In re Millington,* 24 Kan. 214 (1880). The statutory direction for finding one in contempt in this case is found in K.S.A. 20-1201 *et seq.* The procedure followed to obtain valid service must conform with that procedure prescribed in Chapter 20. Process to bring the accused before the court must be served by the sheriff or some other person appointed by the court for that purpose. Where the accused has not waived the service requirement of K.S.A. 20-1204a(b), the court is without jurisdiction to proceed.

Since the court was without jurisdiction to find Pork Motel in contempt, other questions raised in the appeal are moot.

The judgment of the trial court is affirmed in No. 55,087 and reversed in No. 55,352.

PRAGER, J., concurring and dissenting:

I concur with the opinion and affirmance in case No. 55,087. I respectfully dissent from the reversal of case No. 55,352, which reversal was based on the fact that the order directed to Pork Motel to appear and show cause was served by mail on Frank Norton, who had served as counsel for Pork Motel in the case prior to the order to appear and to show cause.

I have concluded from a reading of the transcript of the record that any defects in the service were waived by counsel at the time of the hearing of the motion to show cause held on January 4, 1983. Although counsel for Pork Motel raised the issue of improper service, he advised the court that he did not deny that the order to appear and to show cause was received. The following conversation between the court and defendant's counsel in the transcript should be noted:

"THE COURT: Do you deny receiving it?
"MR. KELLY: No, Your Honor.
"THE COURT: So it's really a moot question.
"MR. KELLY: We just want to raise it. *Yes.*
"THE COURT: But being here you also waive it.
"MR. KELLY: Well, really *I just said we waived it.*
"THE COURT: Yes. Proceed." (Emphasis supplied.)

It is clear that the court asked counsel if the question of service was really a moot question. Counsel responded, "We just want to raise it. Yes." I would interpret this portion of the transcript to mean that counsel for Pork Motel, although desiring to raise the issue, agreed that it was really a moot question and that, defendant being present, waived any defect in the service.

Even in the absence of waiver, it seems overly technical to hold that the district court had no jurisdiction to consider the contempt issue, where the order to show cause was received by defendant's counsel and where defendant appeared in court in response to the order to show cause. The motion to show cause was not the original summons in the case. The case had already been tried on the merits and a judgment entered. I see no reason why K.S.A. 60-205(b), cited in the majority opinion, was not applicable in the case. Under the circumstances, it seems to me it is unreasonable and contrary to the spirit of the Kansas Code of Civil Procedure to hold that the district court had no jurisdiction to proceed.

For the reasons set forth above, I respectfully dissent from the reversal of case No. 55,352.

MILLER and HERD, JJ., join the foregoing concurring and dissenting opinion.