NOT DESIGNATED FOR PUBLICATION

No. 121,742

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KEZIA SHINE,
*Appellee*,

v.

KANSAS STATE BOARD OF HEALING ARTS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; RHONDA K. MASON, judge. Opinion filed June 11, 2021. Reversed.

*Tucker L. Poling*, general counsel, and *Courtney E. Manly*, deputy general counsel, of Kansas State Board of Healing Arts, for appellant.

*Ryan R. Cox*, *Brian Niceswanger*, and *Stephanie A. Preut*, of Evans & Dixon, L.L.C., of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and CLINE, JJ.

PER CURIAM: Generally, a reviewing court can only reverse an agency decision in a limited set of circumstances such as when the agency decision was not supported by substantial competent evidence or if the agency decision was unreasonable, arbitrary, or capricious. See K.S.A. 77-621(c).

In November 2015, the Kansas State Board of Healing Arts (Board) filed a petition alleging that Dr. Kezia Shine, a licensed chiropractor in Kansas, was operating outside her licensed field, performing below the standard of care, committing gross and

1

ordinary negligence, and failing to keep proper medical records. After a long investigation, the administrative law judge (ALJ) held an evidentiary hearing.

The ALJ found that Shine violated the standard of care and committed gross and ordinary negligence and professional misconduct in her treatment of multiple patients. The ALJ suspended Shine's license for 89 days, assessed a fine, and ordered costs assessed to Shine.

After an appeal to the Board, the Board instead revoked Shine's license. It also imposed the Board's proposed costs of over $90,000 against Shine. Shine petitioned for judicial review by the district court.

The district court found that the Board's decision was unreasonable, arbitrary, and capricious and reversed its order. The court reimposed the 89-day license suspension and a portion of the costs requested by the Board. The Board appeals to this court. Because we find that the Board's decision was supported by the evidence and was not unreasonable, we reverse the district court's decision modifying the Board's sanction of revocation and reducing the costs assessed by the Board.

FACTUAL AND PROCEDURAL HISTORY

Dr. Shine, a licensed chiropractor in Kansas, owned and operated Align, L.L.C. (Align) in Kansas. Align shared office space with New Birth Company (New Birth). New Birth is a free-standing birth center, co-owned by an Advanced Practice Registered Nurse (APRN) and midwife, Cathy Gordon, and Kendra Wyatt. A majority of Shine's caseload at Align involved pregnant women. Some of Shine's patients are also patients at New Birth.

2

In November 2015, after investigating various complaints against Dr. Shine, the Board filed a petition alleging that Shine violated the Healing Arts Act related to her treatment of three patients. In its petition, the Board alleged that Shine committed ordinary and gross negligence, in part, by manipulating fetuses and failing to maintain proper records.

The Board presented its case to an ALJ who was appointed to conduct proceedings on the petition.

Patient 1, who filed a complaint against Shine in October 2014, testified that she was one of Shine's patients in 2014. She was also a patient at New Birth. She was visiting Shine to help with general "pregnancy related stuff" including use of the Webster technique. The Webster technique is essentially an adjustment of a pregnant woman's sacrum, pelvis, and soft tissue around the uterus. A properly performed Webster technique does not involve manipulation of the fetus. Patient 1 explained that during a visit with Shine in May 2014, Shine did not provide documentation or explanations about possible risks her proposed chiropractic treatments could entail. Instead, Patient 1's patient record reflected that Patient 1 had heartburn in May 2014 but Patient 1 testified that she never had heartburn during any of her pregnancies.

Patient 1 also testified that during a June 2014 visit with Shine, Shine and another employee at Align that Patient 1 did not recognize taped Patient 1's abdomen. According to Shine's notes regarding Patient 1's treatment, the other individual was Dr. Finan. But Patient 1 stated that she was familiar with Dr. Finan and that was not who assisted Shine tape her abdomen.

Patient 1 explained that Shine taped from the top of her "belly down the two sides." She said that she felt a lot of pressure and could feel that the fetus had moved down into the pelvic area. While applying the tape, Shine pushed the baby down and had

3

the other individual, who Patient 1 identified as the receptionist, help hold the baby down. Patient 1 testified that Shine told her to keep the tape on until right before her appointment with a midwife the next day. According to Patient 1, Shine said that midwives do not approve of the taping because they do not understand the science behind it. According to the patient notes, Shine told Patient 1 to keep the tape on for three to five days, but that she could take the tape off as early as she wanted. But Patient 1 testified that the patient notes did not reflect what she was told in person.

Patient 1's midwife at New Birth noticed marks leftover from the tape and told Patient 1 not to participate in taping again. At a subsequent visit with Shine, Patient 1 told Shine that her midwife told her not to have taping done again and that she should decline taping if Shine offered it. Her patient notes only reflected that she said it itched and did not seem to do anything—which Patient 1 said was inaccurate.

Patient 1 also testified that on June 20, 2014, Shine manipulated the fetus by grabbing down low and wiggling the head of the fetus to figure out what position it was in and then pushed it down a bit. Three days later, Patient 1 entered into labor and went to New Birth. When she arrived, they were unable to detect any fetal heart tones. Personnel at New Birth performed an ultrasound on Patient 1 which showed that her fetus' heart was not beating. Patient 1's child was stillborn. According to Patient 1, there was a "fetal maternal hemorrhage" and the fetus bled out through the umbilical cord.

Patient 2, an employee at New Birth at the time she was pregnant, did not testify at the hearing, but Shine included Patient 2's patient notes as exhibits and an expert later testified about her treatment. Shine first treated Patient 2 in July 2014, when Patient 2 was 31 weeks pregnant. On her first visit, Shine or her staff measured Patient 2's temperature and blood pressure; however, they did not record those measurements on later visits. At a visit the next week, Shine suspected that Patient 2's fetus was in a breach position.

4

After visiting her midwife, Patient 2 could confirm that the fetus was in a breach position. After receiving this confirmation, Shine performed the Webster technique on Patient 2. A few days later, when Patient 2 was 35 weeks pregnant, she visited Shine and told her that she thought the fetus was still in a breach position. During what Shine stated was a "superficial baby position check" Patient 2 "felt a sharp pain" while Shine was performing the initial palpitation. Shine's patient notes reflect that she immediately removed her hand and did not continue treatment that day. When Patient 2 got up from the table she went to the restroom and passed a dark colored blood clot and was bleeding vaginally. Shine had Patient 2 walk next door to the New Birth Center to see her midwife. Around an hour later, an ambulance transported Patient 2 to the hospital. The hospital determined that Patient 2 suffered from a partial placental abruption.

In notes taken by employees at New Birth, Patient 2 reported saying that Shine "'had used some pressure on front ligaments to help loosen them to turn baby, and pushed on him like a deep tissue massage.'" Patient 2 then added that she thought she "'made a mistake.'" Dr. Madison Gilbert, who was an intern at the time, was present during at least some of Patient 2's treatments and testified she did not witness a deep tissue massage or pressure much like a deep tissue massage being applied.

Patient 2 visited Shine again in September and discussed the incident. The patient notes reflected that Patient 2 did not think that any of what happened during treatment that day was different than previous treatments. Patient 2 relayed that her midwives and a doctor said that the incident resulted from Shine's adjustment. Patient 2 did not believe that it was Shine's fault and instead thought it was a combination of things.

Patient 3 started treatment with Shine in February 2014. Patient 3 was 33 weeks pregnant and her fetus was in a breach position. Shine's patient notes for Patient 3 reflect that Shine or one of her employees measured Patient 3's height, weight, and blood pressure. But Patient 3 testified that neither Shine nor her employees measured her

5

height, weight, or blood pressure at the patient visit in February. Patient 3 testified that Shine manually maneuvered the fetus into a head down position by cupping the fetus' head and bottom and turning it in a circular motion.

A little more than a week later, Patient 3 returned, and Shine performed the Webster technique and a diaphragm release. Patient 3 explained that during the same visit Shine cupped the fetus through Patient 3's abdomen and manipulated the fetus to turn it head down. Patient 3 noted that she could feel the baby turn while Shine was pushing on her abdomen.

Patient 3 visited her midwives who suggested that Patient 3 not let Shine adjust her fetus again. At her next visit with Shine, Patient 3 declined Shine's offer to adjust the fetus' position. During at least one visit, Shine suggested that Patient 3 use peppermint to coax the fetus into a nonbreach position. But none of Patient 3's patient notes mention use of peppermint as a suggested strategy.

Dr. Kent Bradley, an obstetrician and gynecologist, testified at the formal hearing. As part of his testimony, Bradley explained that care providers should check pregnant patients' blood pressure at every visit to diagnose preeclampsia—a high risk situation during pregnancy. Bradley testified that pushing on the top of the fundus—the top of the uterus—can be dangerous and the only time that he could think of where it might be appropriate would be if someone was trying to deliver the fetus by C-section. Bradley explained that pushing on the fundus and taping it down is not acceptable in obstetrics unless you are seeking to deliver the fetus. According to Bradley, doing so in any other setting can harm the fetus or baby.

Ultimately, Bradley testified that in his opinion Shine acted with gross negligence. Bradley believed that, based on the records he reviewed, Shine manipulated Patient 1's fetus which is below the standard of care and which he considered gross negligence.

Bradley also noted that the pressure applied to Patient 1's fundus and abdomen could have harmed her fetus. He also believed that taping a pregnant woman's abdomen down would be a breach of the standard of care.

Bradley expressed similar concerns about Shine's treatment of Patient 2. One thing Bradley noted in Patient 2's case is that an external push on a pregnant woman's abdomen followed by pain should be considered a placental abruption until it is ruled out.

Bradley expressed the same concerns about Shine's treatment of Patient 3.

On cross-examination, Bradley acknowledged that his testimony was from the perspective of an OB/GYN, that he was not an expert on chiropractic treatment, and that his opinion on whether Shine was acting with negligence or gross negligence was from the perspective of an OB/GYN. He was also clear to say that he was not testifying that chiropractic care is what caused the complications that the Patients experienced during their pregnancies.

Another expert, Dr. Lynnette Hendrickson, a chiropractor, also testified at the hearing. Hendrickson explained that she has performed the Webster technique on pregnant patients for about 19 years. According to Hendrickson, the Webster technique does not involve applying pressure to the fetus. Hendrickson testified that the application of tape to encourage a fetus to drop was not within the standard of care. Nor, according to Hendrickson, was applying pressure of any form within the standard of care. Hendrickson was also clear that it was not appropriate to push on a fetus. Hendrickson believed that a chiropractor pushing on a fetus was gross negligence. Hendrickson also testified that Shine's record keeping was inadequate relating to Patients 1, 2, and 3.

Hendrickson did believe that Shine met the standard of care related to Patient 2. Still, Hendrickson qualified her statement by saying that her opinion would change if it

7

could be determined that Shine exerted direct pressure on the fetus. After learning that Patient 2 suffered a sharp pain while Shine was pushing on the fetus like a "deep tissue massage," Hendrickson changed her opinion and believed that Shine committed ordinary negligence.

Hendrickson also believed that Shine operated below the standard of care and committed gross negligence in her treatment of Patient 3.

Shine presented testimony from Dr. Rebecca Wayman, an OB/GYN. Wayman testified that in her review of the treatment rendered in the Patients' cases she saw nothing that was threatening to the respective fetuses. In Wayman's view, Shine did not practice obstetrics or medicine on the Patients. Nor was Shine, in Wayman's opinion, responsible for any of the negative events in the Patients' pregnancies. Wayman testified that, in her opinion, nothing Shine did while caring for Patient 1 caused Patient 1 to have a maternal fetal hemorrhage. Nor did she believe that anything Shine did while caring for Patient 2 caused Patient 2 to have a placental abruption. Nor did Wayman believe that any of the treatment offered by Shine was applied or directed toward the fetuses rather than the Patients. Wayman also testified that she did not believe that Shine did anything that amounted to an external cephalic version—external manipulation of the fetus—in her treatment of the Patients. Similarly, Wayman did not believe that the taping would qualify as practicing medicine.

That said, Wayman did note that if Shine was performing an external cephalic version, her opinion would change and she would conclude that Shine was practicing medicine.

Shine also called Dr. Arley Wisner, a chiropractor and educator at Cleveland University, as a witness at the formal hearing. Wisner testified that she believed that

8

Shine met the standard of care and did not practice outside the scope of chiropractic care for all three patients. She also believed that Shine took proper patient history.

On cross-examination, Wisner agreed that manipulation of the fetus would be outside the standard of care for a chiropractor. She also acknowledged that there was information not in the patient records that was pertinent to the individual cases.

In her initial order of January 2018, the ALJ found that there were multiple times where Shine failed to properly document her procedures and failed to take proper biometric information during many of the relevant visits. Ultimately, the ALJ found that Shine acted unprofessionally by failing to keep accurate medical records and committed negligence by failing to take biometric data. The ALJ found that Patient 1's testimony that Shine pushed on her abdomen to reposition her fetus was compelling and held that Shine's manipulation of the fetus constituted gross negligence.

The ALJ found that Patient 2's statements regarding Shine pushing her abdomen in a manner similar to a deep tissue massage were reliable given the short time between the contact and the statements. Given those statements, the ALJ determined that Shine manipulated Patient 2's fetus and acted outside the scope of chiropractic care and that the act constituted gross negligence.

As for Patient 3, the ALJ determined that Shine committed gross negligence by turning the fetus after cupping the bottom and head of the fetus through Patient 3's abdomen.

When deciding what sanction to impose, the ALJ noted that Shine's conduct could not have been a huge concern to the Board because it allowed her to keep practicing for three years while this case was pending. Given the severity of her actions and the Board's

lack of urgency, the ALJ imposed an 89-day suspension, a $5,000 fine, probation, and assessed costs of the proceeding to Shine.

The Board timely issued a notice of intent to review the initial order. The Board stated that it would review the findings of fact and conclusions of law in the initial order and that each party would have a chance to present briefs and oral arguments.

As to the costs of the proceedings, the Board requested that Shine pay $93,324.65 as costs and expenses related to the hearings.

Shine testified at the oral arguments held before the Board. Shine testified that she had not changed her practice in any way since the Board brought its concerns to her attention. Even so, she did change her documentation system.

Before rendering its opinion, the Board considered the agency record—including the hearing transcript, exhibits, briefs, and motions. The Board noted that it gave due regard to the ALJ's opportunity to observe the witnesses at the hearing. The Board adopted the ALJ's findings of fact.

After considering the transcript and exhibits, the Board revoked Shine's license to practice chiropractic care in Kansas and further ordered Shine to pay costs in the amount of $93,324.65. In reaching its decision, the Board rejected "the Initial Order's discussion regarding the proper timing for revocation, as the sanction of revocation is not limited to emergency proceedings."

Shine filed a petition for judicial review. After hearing oral arguments, the district court issued its findings of fact and conclusions of law in April 2019. The district court noted that there was a deficiency in the medical documentation done by Shine as it related to the Patients. The district court found that Shine pushed on Patient 1's

10

abdomen—repositioning the fetus—but noted that the evidence did not show that Shine caused any injury or adverse outcome by doing so.

As for Patient 2, the district court acknowledged Patient 2's contemporaneous report that Shine pushed on her fetus like in a deep tissue massage and Shine's explanation that any contact with Patient 2's fetus was incidental and there was no manipulation of the fetus.

The court then noted that Shine manipulated Patient 3's fetus by cupping its head and bottom to guide it in a circular motion. The court also noted that no evidence suggested that Shine caused an injury or adverse outcome to Patient 3.

The district court also considered the testimony and opinions from the multiple experts on whether Shine committed some form of negligence through her care.

The district court found that there was "substantial evidence to support the ALJ's temporary suspension and fine, but there is not substantial evidence to support [the Board's] extensive upward deviation from the ALJ's punishment." The court rejected the Board's characterization of the ALJ's statements about the time it took to begin proceedings, noting that the ALJ did not think that revocation could only occur during emergency proceedings; instead, as the court saw it, the ALJ merely considered the Board's lack of significant action for several years as a mitigating factor.

When discussing the different sanctions imposed by the ALJ and the Board, the district court concluded that the difference might be, in part, because of the ALJ's belief that there was a good chance that Shine would adjust her behavior versus the Board's belief that Shine lacked potential for rehabilitation given her testimony at the hearing before the Board. The court then inferred "from the lack of incidents over the last four years that [Shine] has, in fact, altered her practice" to avoid similar issues.

11

In the district court's view, once the Board's finding of lack of potential for rehabilitation was removed from the Board's aggravating factors, "it is clear that a penalty of revocation cannot stand in the face of significant mitigating factors." As a result, the district court reversed the Board's decision and reimposed the ALJ's sanction of an 89-day suspension, probation, $5,000 fine, and costs.

The Board filed a motion to clarify, which addressed the costs aspect of the district court's order. The Board sought to clarify if the district court's order included the full $93,324.65 as "costs." The district court issued another order in June 2019. The district court clarified that an assessment of costs equaling $93,324.65 was disproportionate to the misconduct committed. The district court imposed costs in the amount of $14,630.75, which was the aggregate of the transcripts and court reporter fees for eight days of hearings. The court also clarified that it was still imposing the $5,000 fine. The district court also credited Shine with the time she refrained from practicing in Kansas and determined that she had served her suspension. Thus, the court reinstated Shine's license and ordered her to face probation as determined by the Board.

The Board timely appealed.

We will add additional facts as necessary.

ANALYSIS

*The district court erred by reversing the Board's revocation of Shine's license and reinstating the sanction imposed by the ALJ.*

*We review the Board's decision for substantial evidence and reasonableness.*

The Kansas Judicial Review Act (KJRA) governs the review of this case. K.S.A. 77-603(a). This court applies the same limited review of the agency's action as the district court had to apply. *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017).

The burden of proving that the agency action was invalid rests on the party asserting invalidity. K.S.A. 77-621(a)(1). A court shall only grant relief in the limited set of circumstances set out in K.S.A. 77-621(c). Pertinent to this case, if

> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

> "(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

When reviewing the evidence in light of the record as a whole, the reviewing court "shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

13

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019).

*The Board's decision was supported by substantial evidence.*

The Kansas Legislature has provided the Board with the authority to administer the Kansas Healing Arts Act (KHAA). K.S.A. 65-2812. The practice of the healing arts is a privilege, not a right. K.S.A. 65-2801. Under the KHAA, chiropractors are "expressly prohibited from . . . practicing obstetrics." K.S.A. 65-2871.

Any licensee under the KHAA may have his or her license "revoked, suspended or limited, or the licensee may be publicly or privately censured or placed under probationary conditions, or an application for a license or for reinstatement of a license may be denied upon a finding of the existence of any" of several reasons as set out by the statute. K.S.A. 2014 Supp. 65-2836. Those reasons relevant here include:

> "(b) The licensee has committed an act of unprofessional or dishonorable conduct or professional incompetency.
>
> ". . . .
>
> "(f) The licensee has willfully or repeatedly violated this act, . . . or any rules and regulations adopted pursuant thereto, or any rules and regulations of the secretary of health and environment which are relevant to the practice of the healing arts.
>
> ". . . .
>
> "(k) The licensee has violated any lawful rule and regulation promulgated by the board or violated any lawful order or directive of the board previously entered by the board." K.S.A. 2014 Supp. 65-2836.

14

"Professional incompetency" as used in K.S.A. 2014 Supp. 65-2836 is defined as:

"(1) One or more instances involving failure to adhere to the applicable standard of care to a degree which constitutes gross negligence, as determined by the board.

"(2) Repeated instances involving failure to adhere to the applicable standard of care to a degree which constitutes ordinary negligence, as determined by the board.

"(3) A pattern of practice or other behavior which demonstrates a manifest incapacity or incompetence to practice the healing arts." K.S.A. 2014 Supp. 65-2837(a).

"Unprofessional conduct" as used in K.S.A. 2014 Supp. 65-2836 is defined, in part, as:

"(12) Conduct likely to deceive, defraud or harm the public.

". . . .

"(24) Repeated failure to practice healing arts with that level of care, skill and treatment which is recognized by a reasonably prudent similar practitioner as being acceptable under similar conditions and circumstances.

"(25) Failure to keep written medical records which accurately describe the services rendered to the patient, including patient histories, pertinent findings, examination results and test results." K.S.A. 2014 Supp. 65-2837(b).

Further, K.A.R. 100-24-1(a) requires a licensee subject to the oversight of the Board to "maintain an adequate record for each patient for whom the licensee performs a professional service." Each patient record must meet these requirements:

"(1) Be legible;

"(2) contain only those terms and abbreviations that are or should be comprehensible to similar licensees;

"(3) contain adequate identification of the patient;

"(4) indicate the dates any professional service was provided;

15

"(5) contain pertinent and significant information concerning the patient's condition;

"(6) reflect what examinations, vital signs, and tests were obtained, performed, or ordered and the findings and results of each;

"(7) indicate the initial diagnosis and the patient's initial reason for seeking the licensee's services;

"(8) indicate the medications prescribed, dispensed, or administered and the quantity and strength of each;

"(9) reflect the treatment performed or recommended;

"(10) document the patient's progress during the course of treatment provided by the licensee; and

"(11) include all patient records received from other health care providers, if those records formed the basis for a treatment decision by the licensee." K.A.R. 100-24-1(b).

The ALJ, Board, and district court all agree that Shine violated the law and Board regulations during her treatment of Patients 1, 2, and 3. The district court noted that "[t]here is a myriad of evidence to support the ALJ's conclusion of misconduct, professional incompetency, and gross negligence." On appeal, the parties essentially concede, by their failure to argue otherwise, that Shine violated the statutes and regulations. Instead, the question is whether the evidence supported the Board's decision that revocation was the appropriate sanction.

The Kansas Administrative Procedure Act provides that when the agency head, in this case the Board, reviews an initial order, in this case the ALJ order, the Board engages in de novo review. Even so, the Board has to "give due regard to the presiding officer's opportunity to observe the witnesses and to determine the credibility of witnesses." K.S.A. 77-527(d). In essence, the Board was free to reach its own conclusions in this case, so long as it gave "due regard" to the ALJ's observations of the witnesses. See K.S.A. 77-527(d). The ALJ's ultimate decision becomes, in the end, a nullity.

16

On the other hand, the district court here could only reverse the Board's ruling if the Board's decision was not supported by substantial evidence or if the Board acted unreasonably, arbitrarily, or capriciously. K.S.A. 77-621(c)(7)-(8). The district court does not compare the ALJ ruling to the Board ruling and decide which one it believes is more appropriate. The Board's order has a presumption of validity, and Shine bears the burden of proving its invalidity. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 382, 673 P.2d 1126 (1983) (finding agency order has presumption of validity); see K.S.A. 77-621(a)(1) (burden on party asserting invalidity of agency action).

As this court has noted, the Board is entitled and expected to rely on the expertise of its members when reaching decisions. *Hart v. Kansas Bd. of Healing Arts*, 27 Kan. App. 2d 213, 217-18, 2 P.3d 797 (2000). The Board consists of 15 members, including five doctors of medicine, three doctors of osteopathy, three doctors of chiropractic form, one podiatrist, and three public members. K.S.A. 65-2812; K.S.A. 65-2813. Here, the Board adopted the ALJ's findings of fact in their entirety and, based on its expertise, placed specific emphasis on some of those facts when it reached its decision. The Board determined—as had the ALJ—that Shine committed acts that constituted ordinary and gross negligence, professional incompetency, and unprofessional conduct in violation of K.S.A. 2014 Supp. 65-2836, K.S.A. 2014 Supp. 65-2837, and K.A.R. 100-24-1. Contrary to the arguments put forth by Shine, there need not be any proof that the practitioner injured a patient to establish incompetency or negligence in treatment. See *Fieser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 275, 130 P.3d 555 (2006) (also citing similar caselaw from other jurisdictions). The Board also took into account Shine's testimony before the Board, during which it was able to ask her questions and directly assess her credibility.

We have no trouble finding that substantial competent evidence supported the Board's decision that Shine committed acts that constituted ordinary and gross

17

negligence, professional incompetency, and unprofessional conduct in violation of Kansas statutes and regulations.

*The Board's decision to revoke Shine's license was not unreasonable, arbitrary, or capricious.*

The remaining question is whether the district court, and similarly this court, can say that the evidence available was insufficient to warrant the Board's revocation of Shine's license. In other words, did the Board act unreasonably, arbitrarily, or capriciously?

"An agency action is arbitrary and capricious if it is unreasonable or without foundation in fact." *Wright v. Kansas State Board of Education*, 46 Kan. App. 2d 1046, 1059, 268 P.3d 1231 (2012). The Kansas Supreme Court has explained that an action is arbitrary if a court acts "without adequate determining principles" or without "acting according to reason or judgment." *Dillon Stores v. Board of Sedgwick County Comm'rs*, 259 Kan. 295, Syl. ¶ 3, 912 P.2d 170 (1996).

The Board's decision was not unreasonable, arbitrary, or capricious under the circumstances. The Board considered the evidence the ALJ examined, as well as Shine's testimony, and found, just as the ALJ had, that Shine violated the KHAA's and the Board's regulations. It adopted all of the ALJ's factual findings. The Board referred to its own nonbinding guidance document "'Guidelines for the Imposition of Disciplinary Sanctions'" and noted that under the guidelines, revocation was the proper punishment. See http://www.ksbha.org/documents/publications/ksbha_guidance_documents%2005 _15.pdf, p. 54. Professional disciplinary bodies often look to their local rules as well as national guidelines in imposing discipline. Use of such guidelines assists such bodies in "selecting appropriate and uniform discipline, depending upon the facts and the aggravating and mitigating factors of each case." *In re Keithley*, 252 Kan. 1053, 1057,

18

850 P.2d 277 (1993) (discussing Standards for Imposing Lawyer Sanctions); see, e.g., *In re Mintz*, 298 Kan. 897, 912, 317 P.3d 756 (2014) ("Generally, in determining the appropriate level of discipline, this court considers the factors outlined by the ABA Standards.").

The ALJ also considered the Board's guidelines. But she found the primary mitigating factors—the Board's failure to launch emergency proceedings if it felt Shine was a danger to the public, no previous disciplinary action against Shine, Shine's good reputation, and no new disciplinary actions since these were filed as an indication that she has likely adjusted her behavior—outweighed the aggravating factors that supported revocation under the guidelines. She listed the aggravating factors as the number and frequency of the acts, the potential for injury, respondent's failure to admit to facts, and no demonstration of remorse. She also noted that Shine committed serious violations and was resistive to the Board's involvement.

The Board disagreed with the ALJ's ultimate conclusion. The Board considered and agreed with most of the mitigating factors presented by Shine and adopted by the ALJ which included the time between the allegations and the formal hearing, the fact that this was Shine's first disciplinary action before the Board, and that she had no criminal, immoral, or dishonest motive, nor were her violations for personal gain. But the Board did not believe that the mitigating factors outweighed the aggravating factors. The Board outlined in detail the lengthy process of investigation of a complaint. We also take note, as it relates to the mitigating factors, that Shine has not argued that the process was purposefully or unlawfully prolonged by the Board or its investigators. Nothing suggests that the investigation took the time it did for any reason other than the number and severity of the charges. In addition, as pointed out by the Board at oral argument, Shine presents no caselaw to suggest that an agency is required to launch the ex parte emergency temporary suspension procedures set out in K.S.A. 77-536 before it can find

19

that revocation is necessary to protect the public health and safety from a practitioner's gross negligence.

The Board also accepted the credibility determinations made by the ALJ. This included a finding that Shine was *not* credible. As for aggravating factors, the Board found:

"Respondent's actions were intentional for the most serious acts, Respondent failed to show remorse or consciousness of the wrongfulness of her conduct, Respondent failed to admit key facts, the nature and gravity of the allegations against Respondent are grave, Respondent's commission of wrongful acts was frequent and repeated, Respondent's degree of negligence was grossly negligent, Respondent lacks a potential for rehabilitation as displayed by her refusal to change her practice after this action was brought, Respondent's acts show a pattern of misconduct, and Respondent is an experienced practitioner."

Shine testified personally before the Board that other than a new computer patient management system she had not changed her practice in any way since the concerns in this case were brought to her attention.

Ultimately, the Board reached a reasoned decision based on the evidence before it. Even if the Board's decision is not the same as the ALJ, the district court, or this court would have made under the circumstances, this court cannot say that the Board acted unreasonably, arbitrarily, or capriciously. Moreover, substantial competent evidence supported the Board's decision. See *Geer*, 309 Kan. at 190. For those reasons, we find that the district court erred when it reversed the Board's revocation of Shine's license.

*The district court erred by reducing the amount of costs imposed on Shine.*

The final issue on appeal relates to the district court's decision to reverse the Board's order of costs, the imposition of costs in the amount of $14,630.75, and preservation issues relating to the imposed costs.

*We review the Board's decision regarding costs for substantial evidence and reasonableness.*

Shine asserts that the proper standard of review of this issue requires this court to determine whether the district court abused its discretion in reducing the amount of costs imposed on Shine. Yet she does not provide any supporting authority for her assertion. On the other hand, the Board does not provide a standard of review at all.

We find that the standard of review for costs imposed by the Board is no different than our review of the more substantive parts of the Board's decision. We examine whether there was substantial evidence to support the Board's decision and whether the Board's decision related to costs was reasonable. See K.S.A. 77-621(c)(7)-(8).

*The Board's assessment of costs was supported by substantial evidence.*

We find that Shine and the Board properly preserved their arguments regarding the imposition of costs.

The statute regarding the assessment of costs is clear and unambiguous. K.S.A. 65-2846(a) provides that

"if the board's order is adverse to the licensee . . . costs incurred by the board in conducting any investigation or proceeding under the Kansas administrative procedure

21

act may be assessed against the parties to the proceeding in such proportion as the board may determine upon consideration of all relevant circumstances."

Costs are defined to nonexclusively include "[t]he presiding officer fees and expenses, costs of making any transcripts, reasonable investigative costs, witness fees and expenses, mileage, travel allowances and subsistence expenses of board employees and fees and expenses of agents of the board." K.S.A. 65-2846(b). Finally, "[t]he board shall make any assessment of costs incurred as part of the final order rendered in the proceeding." K.S.A. 65-2846(c).

The district court did not believe that the Board's decision to impose the full $93,324.65 was appropriate under the circumstances. But the district court's decision assumed that revocation was not an appropriate sanction for Shine and based its decision on the severity level of the final action. Given our contrary finding, this assumption was flawed. Moreover, as Shine conceded at oral argument, the parties agree that the costs claimed were incurred. In other words, Shine is not challenging—nor has she ever challenged—any of the charges that make up the total costs of $93,324.65. For that reason, the costs assessed by the Board were supported by substantial evidence.

*The Board's assessment of costs was reasonable.*

And finally, we find that the assessment of the total amount of costs incurred was not unreasonable, arbitrary, or capricious. As argued by the Board, the assessment of costs is a reflection of the costs incurred, not an amount based on the severity of the violation or the degree to which the order was adverse to the licensee. The costs permitted under the statute, K.S.A. 65-2846, are not punitive; punitive fines are provided for in K.S.A. 65-2863a. Shine argues on appeal that the Board's interpretation of costs would allow the Board to shift all of its costs on any claim to the practitioner, "even if the costs were exorbitant." But again, Shine has never argued, nor did the district court find,

22

that the costs submitted to the Board here were inflated, or exorbitant, or that they were not incurred in the investigation and presentation of the complaints against Shine to the ALJ. We would agree that the district court would have wide discretion in evaluating the appropriateness of the fees assessed in much the same way a district court analyzes the appropriateness of attorney fees claimed in civil cases. See, e.g., *Johnson v. Westhoff Sand Co., Inc.*, 281 Kan. 930, 940, 135 P.3d 1127 (2006) (holding that the district court is an expert on attorney fees and can apply its own knowledge and professional experience in determining the value of service rendered). Likewise, district court judges can apply their knowledge and professional experience in determining whether certain litigation costs were appropriate or exorbitant. But there was no such finding here. And it is the reasonableness of the Board's decision that we are to review here, not the district court's. For these reasons, we find that the Board's full assessment of costs to Shine was reasonable and the district court's decision to reduce the costs assessed by the Board based solely on the severity of the sanction imposed by the ALJ was error.

The decision of the district court is reversed. The decision of the Board revoking Shine's professional chiropractor license and assessing costs of $93,324.65 is reinstated.

Reversed.